**UNITED STATES of America**

v.

**George E. ALLARD, Sr., Appellant,**
**John McAnall Eaton.**

**No. 19443.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 6, 1971.

Decided Feb. 15, 1972.

Robert L. Podvey, Podvey, Sachs & Kaltenbacher, Newark, N. J., for appellant.

William Braniff, Asst. U. S. Atty., Newark, N. J. (Herbert J. Stern, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before HASTIE, ALDISERT and JAMES ROSEN, Circuit Judges.

## OPINION OF THE COURT

HASTIE, Circuit Judge.

On this appeal we review a conviction on one count of an indictment that charged the appellant, Allard, with causing the transportation of certain securities from New Jersey to New York knowing that they had been taken by fraud and converted in violation of 18 U.S.Code § 2314.

At the outset we observe that the indictment charges, in the conjunctive, knowledge that the securities had been "taken by fraud and converted", while the statute covers, in the disjunctive, knowledge that the securities had been "converted or taken by fraud". The law, as stated in similar cases, makes it clear that under such a statute knowledge of both a fraudulent taking and a conversion may be pleaded, and thereafter proof of either will sustain a conviction. Fields v. United States, 5th Cir. 1969, 408 F.2d 885; Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521. The prosecution undertook to prove that Allard caused securities to be transported with knowledge that they had been taken by fraud.

The securities in question belonged to Mrs. Alice Eaton, shown by the evidence to have been an infirm, feeble and forgetful woman of more than 90 years. The appellant Allard managed the apartment building in which Mrs. Eaton lived. He became her close friend and visited her every day or two. She came to rely upon him for guidance and for handling financial and other personal matters. Mrs. Eaton had two sons, John and Fred, neither of whom lived with her. At the times in question John was 67 years old. He had a drinking problem and frequently drank excessively. Like his mother, John relied upon Allard for advice and assistance in financial and other personal matters. At times Allard supplied him with whiskey. At other times Allard took liquor from him.

Mrs. Eaton kept her securities at a bank in a safe deposit box. Both of her sons had access to the box. According to John's testimony, at a time when he was "under the influence of liquor", Allard proposed that he take his mother's "securities out of the safe deposit box before my brother grabbed them". Accordingly, John obtained his mother's permission to remove the securities from the bank and he did so. Then, according to John, Allard told him that the securities "had to be sold". John, in Allard's presence, had his mother endorse the securities. John, escorted by Allard, then took them immediately to a stockbroker's office in New Jersey to arrange for their sale. On that occasion both men learned that in order to accomplish the sale, the broker would send the securities to New York for sale through a clearing house. The broker did transport the securities to New York where they were sold. The proceeds, in the form of a check for some $117,000, were mailed to Mrs. Eaton.

It was the practice in the Eaton household that Mrs. Eaton's maid, a person whom Allard had selected, would give Allard all business mail addressed to Mrs. Eaton. Accordingly, the maid delivered the $117,000 check to him. Thereafter, Mrs. Eaton endorsed the check and signed an authorization empowering a bank to put about half of the proceeds in two savings accounts in John's name as trustee for her, and to deliver the remaining $60,000 to John. Allard drove John to the bank where John presented the check and the authorization, obtained the $60,000 in the form of a certified check and opened the trust accounts.

Allard then took John directly to a neighboring bank where John cashed the $60,000 check. Upon emerging from the bank John handed the $60,000 in cash to Allard who was waiting outside. John testified that he did this because he thought Allard was going to keep the money for him.

Thereafter, through a series of transactions Allard and John accomplished the transfer of almost all of the amounts in the two trust accounts to Allard. Thus, substantially the entire proceeds of the sale of securities eventually came to Allard. And John testified that only about $3,000 of this large sum was returned to him in small amounts from time to time for his day to day needs. On the other hand, during or shortly after this period Allard made numbers of large personal expenditures including the purchase of a 1968 Cadillac, which he traded in a few months later on a 1969 model, a European trip for himself and three members of his family, and payments of $25,000 on the purchase of a home. Yet, during the relevant periods, joint tax returns filed by Allard and his wife never showed income exceeding $6,200 in any one year.

Allard did not testify. The foregoing summarization of evidence concerning the transportation and sale of Mrs. Eaton's securities and the disposition of the proceeds shows the evidentiary basis upon which the jury decided that Allard "caused" the transportation of Mrs. Eaton's securities from New Jersey to New York,[1] knowing that they had been "taken by fraud." The appellant argues that such a finding was precluded by the fact that the securities still belonged to Mrs. Eaton when they were transported and that they then were being handled in a way to which she had agreed. However, in our view those circumstances are not necessarily dispositive.

The evidence justified a finding that from his original proposal that John remove the securities from the safe deposit box until his own acquisition of almost the entire proceeds of their sale, Allard was carrying out a scheme he had

---

1. *Cf.* Pereira v. United States, 1953, 347 U.S. 1, 10, 74 S.Ct. 358, 98 L.Ed. 435; Halfen v. United States, 10th Cir. 1963, 324 F.2d 52, 55.

conceived for defrauding Mrs. Eaton of her property, using her son, a pliant and not notably perceptive alcoholic, as an instrumentality essential to the accomplishment of his design. He could properly be found to have known that the securities had been taken by fraud in the sense that he caused their taking by John and their transportation by the innocent broker as initial steps in the accomplishment of his plan to despoil their owner.

Finally, it is urged that because of the fact, not heretofore mentioned, that the jury acquitted Allard on a count charging him with having conspired with John Eaton to transport the securities, knowing they had been taken by fraud, it was the jury's duty also to acquit him on the substantive charge of causing such transportation.[2]

We find no necessary contradiction in the verdicts on the separate counts. On the present record the jury may well have concluded that when the securities were taken and transported, and even when they were sold, John had no more in his befuddled mind[3] than that these procedures would, as Allard had suggested to him prevent his brother from getting that property. The record strongly indicates that John was a sick man, dominated and controlled by Allard and guided and directed step by step without explanation or understanding, at the time the securities were transported and sold, of Allard's overall scheme to defraud his mother.

Other points are urged by the appellant. In our view, none of them is well taken.

The judgment will be affirmed.

2. John Eaton had previously pleaded guilty on both counts of the indictment.

3. Testifying about one of the transactions during the period relevant to this case, John Eaton testified: "I might have done anything at that point because my mind was in a state of confusion, super induced by alcoholic beverages." At another

point, Eaton testified that during the period when he was "going from bank to bank" he was drinking.