UNITED STATES of America, Appellee,

v.

Edward KROGSTAD, Appellant.

No. 77–1573.

United States Court of Appeals,
Third Circuit.

Argued Jan. 6, 1978.

Decided April 12, 1978.

James B. Smith, Metuchen, N. J., for appellant.

Robert J. Del Tufo, U. S. Atty., Ralph A. Jacobs, Asst. U. S. Atty., Newark, N. J., for appellee.

\* Donald W. VanArtsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Before ROSENN and HIGGINBOTHAM, Circuit Judges and VanARTSDALEN, District Judge.\*

## OPINION OF THE COURT

VanARTSDALEN, District Judge.

### I.

The defendant, Edward Krogstad (Krogstad), president and majority shareholder of Power Flow, Inc. (Power Flow),[1] was charged with conspiracy, falsifying federal quarterly employer tax returns, and causing, aiding and abetting a federal internal revenue agent to submit a false audit report, all in regard to Power Flow's 1969 and 1970 employer tax returns. Count I of the indictment charged Krogstad, Joseph Vetere (Vetere), an accountant, and Emmett F. Diehl (Diehl), an Internal Revenue Service (IRS) agent, with conspiracy in violation of 18 U.S.C. § 371. Counts II, III and IV charged only Krogstad with making and causing to be subscribed three separate false federal quarterly employer tax returns for Power Flow in violation of 26 U.S.C. § 7206(1). Count V charged Krogstad, Vetere and Diehl with causing, aiding and abetting Diehl to submit a false and fraudulent audit report to the IRS with respect to the 1969 and 1970 federal employer tax returns filed by Power Flow, in violation of 18 U.S.C. §§ 2, 1001. In substance, the indictment charged that Power Flow filed false employer tax returns by understating the true number of its employees and, thus, not reporting and failing to pay the appropriate amount of income and social security taxes withheld as to such employees. Thereafter, in an attempt to cover-up the false returns, the indictment charges that Diehl, the IRS auditor, was bribed in return for filing a false audit report that in substance approved the false returns as filed.

1. Krogstad owned 51% of the stock; Thomas Siggia (Siggia) owned the remaining 49%.

Vetere and Diehl entered guilty pleas to some or all of the charges pending against them and Krogstad was tried alone. Neither Vetere nor Diehl testified at Krogstad's trial. The jury convicted the defendant of Count V (causing, aiding and abetting) and acquitted him of the remaining counts. Several issues have been raised on appeal, only three of which need be addressed. For the reasons to follow, we will affirm the conviction.

## II.

Certain testimony as to Diehl's activities and statements was received into evidence under the so-called "co-conspirator exception" to the hearsay rule, as expressly provided and codified in the Federal Rules of Evidence 801(d)(2)(E).[2] Because the defendant was acquitted on the conspiracy charge, he contends that both under the law and the district court's instructions, the jury could not consider the evidence admitted under Rule 801(d)(2)(E) as to Count V which charged him with causing, aiding and abetting the submission of the false audit report. Absent this evidence, the defendant contends the Government's case was insufficient as a matter of law to convict him. He concludes therefore that the jury's verdict must necessarily have been based upon an improper consideration of such evidence.

Defendant does not challenge the admissibility of any evidence including that admitted under Rule 801(d)(2)(E). In addition, he does not here challenge the district court's instructions to the jury. In those instructions the court stated:

Now, whenever it appears beyond a reasonable doubt from the evidence in this case that a conspiracy existed and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done, by any person likewise found by you to be a member of the conspiracy may be considered as evidence in the case as to the defendant found to be a member of the conspiracy, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the conspiracy. Otherwise any admission or incriminating statement made or act done outside of the court by one person may not be considered as evidence against any person who was not present and did not hear the statement made or see the act done.

■ Our first inquiry is whether the evidence presented by the Government, excluding all evidence that was admitted under Rule 801(d)(2)(E), was sufficient to sustain a conviction on the causing, aiding and abetting count. If it was then we need not concern ourselves with whether the jury, of necessity, considered certain evidence admitted under Rule 801(d)(2)(E) that the district court directed it could not consider absent a preliminary finding by the jury that a conspiracy existed. We conclude that the nonhearsay evidence is independently sufficient to sustain the conviction.

An assessment of the Government's evidence as to the charges in Count V requires a two-fold inquiry. First, was the evidence sufficient for the jury to find beyond a reasonable doubt that Diehl knowingly submitted a false audit report? Second, was the evidence sufficient for the jury to find beyond a reasonable doubt that Krogstad caused, aided and abetted the submission of a false audit report by Diehl? To answer these questions, we look to the trial transcript to ascertain what relevant evidence

---

**2.** That rule provides, in pertinent part, as follows:

801. Definitions . . .
  (d) Statements which are not hearsay. A statement is not hearsay if—
  (2) Admission by party-opponent. The statement is offered against a party and is

. . . (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

Although often referred to as an exception to the hearsay rule, strictly speaking under the Federal Rules of Evidence, by definition such evidence is not hearsay.

was admitted that does not fall under Rule 801(d)(2)(E).

Krogstad was president and Siggia vice-president of Power Flow which engaged in essentially three types of enterprises: it was a general construction contractor, and it performed engineering services and technical consulting for other businesses, and it supplied other businesses temporary draftsmen, designers and engineers. This latter phase of the business was described as analogous to the well-known "Kelly Girl" type of operation. Power Flow was responsible, as the employer, for paying wages and collecting, reporting and paying all federal employee withholding and social security taxes. For the services it provided, Power Flow would bill the customers who had engaged the temporary draftsmen, designers and engineers the gross wages plus an additional amount for its overhead and profit. Although wages had to be paid on a current basis, billings and collections were not always immediate. Due to a relatively small capital investment by the corporate owners, Power Flow faced a serious and continuing cash flow shortage commencing in late 1968 and continuing through 1970. Excessive overhead and interest on loans obtained to meet payroll and current operating expenses depleted the cash reserves and whatever profits might otherwise have been generated.

The above facts were clearly established and substantially confirmed by the defendant, who testified in his own behalf.

John Battaglino (Battaglino) was the former comptroller of Power Flow and was a named, but unindicted, co-conspirator. At defendant's trial, he testified under a grant of immunity as one of the principal Government witnesses. A summary of the substance of his testimony follows.

At a time when there was insufficient cash on hand to pay the federal employer withholding and social security taxes due for the second quarter of 1969, Battaglino met with Krogstad and Siggia. He told them that there were only two practical solutions: either (1) drastically reduce overhead expenses by discharging most of the

office employees, or (2) file false federal quarterly tax reports on IRS Form 941 by listing fewer employees than were actually on the payroll. By so doing, Power Flow would be able to retain the withholding and social security taxes normally deducted from the employees' salaries and paid quarterly to the federal government. Krogstad and Siggia agreed to follow the course of submitting false returns. Pursuant to this agreement, Battaglino prepared and Power Flow filed six consecutive false IRS Form 941 federal quarterly employer tax returns, encompassing the last three quarters of 1969 and the first three quarters of 1970. By late 1970 the financial condition of Power Flow had improved to such an extent that further falsifications were deemed unnecessary.

To cover up the false returns that had been filed, a new corporation was formed and named PFI Technical Services (PFI). By so doing, the tax returns to be thereafter filed by Power Flow would not show a suspiciously sudden increase in number of employees, payroll, and taxes for the last quarter of 1970 and subsequent periods. The records would show many of the temporary employees that should have been reported by Power Flow as being employees of PFI.

Eventually the IRS inquired of Power Flow about the 1969 wages subject to social security taxes of a recently retired employee who had not been reported by Power Flow as one of its employees. The retired employee had applied for the social security payments to which he was entitled. Power Flow had supplied to all its employees, whether or not they were reported on the quarterly IRS 941 forms, the appropriate W–2 wage earning statements, but had not forwarded copies of them to the IRS as to those employees not reported on the quarterly reports. Recognizing that similar problems would reoccur as other employees retired and sought retirement benefits but whose wages or salaries had not been reported to IRS, Krogstad, Siggia and Batta-

glino [3] ascertained the names of all employees who would probably retire and be entitled to social security payments within the next several years, and whose wages and salaries had not been reported. They then prepared corrected Form 941's (IRS Form 941C), listing such previously unreported employees and paying the taxes thereon.

Battaglino further testified that around April of 1971, Diehl, an IRS agent, wrote to Power Flow advising that the employer tax returns for the year 1969 would be audited. Krogstad, Siggia and Battaglino met to discuss how to avoid discovery of the fraud. At the meeting either Siggia or Battaglino suggested they talk with Vetere, Power Flow's independent certified public accountant, who was a former IRS agent himself, to see if "this agent [Diehl] can be worked with such as maybe he can falsify his report in return for some money." All agreed with this course of action, and Battaglino thereafter had discussions with Vetere.

Diehl came to Power Flow to conduct the audit, and during the course of that audit, he and Vetere worked together behind closed doors. Battaglino brought them books and records from time to time so they could conduct the audit, although there was no identification of what books or records were examined by Diehl.

After Diehl completed his examination at Power Flow, Battaglino talked with Vetere, and then he talked with Krogstad and Siggia. Battaglino told Krogstad and Siggia that although on a correct audit, for the years 1969 and 1970, they would owe approximately $150,000 to $200,000 in unpaid taxes, agent Diehl would do the 1969 audit "but in turn would want $30,000 in a payoff." All three present then agreed to go along with the deal, but only if 1970 was also included and cleared. Although Battaglino told Krogstad and Siggia that the payoff to Diehl was to be $30,000.00, in actuality Battaglino intended that Diehl would receive only a $10,000 bribe and that

he (Battaglino) and Vetere would each receive $10,000.00.

Four checks were drawn from the accounts of PFI and Power Flow to pay the $30,000 bribe. The checks were ostensibly drawn for "cash payroll." [4] Two checks in the sum of $12,500 each were drawn in cash on regular paydays, of which $2,500 from each check was utilized for payroll and the $10,000 balance for the bribe. In addition. two checks, each for $5,000 apiece, were cashed on days that were not regular paydays, although shown as being "cash payroll." [5] Those four checks were drawn over a period commencing May 19, 1971 and ending September 13, 1971. One of the $10,000 amounts of cash was handed to Krogstad by Battaglino, Krogstad stating at the time that he, Krogstad, would deliver the money to Vetere.

Sometime after the audit, Battaglino and Krogstad had disagreements, and Battaglino either resigned or was fired. Power Flow was under no contractual obligation to continue Battaglino's employment or pay him any severance pay or other benefits. In order to keep him silent about the wrongdoing, Siggia agreed to pay Battaglino $1300 every two weeks for a year, a figure which was substantially more money than Battaglino had been receiving as an employee. He was paid the money and on occasions when payments were late, he contacted Power Flow and was always promised and promptly thereafter received payment. Krogstad was at least aware of these payments.

Battaglino testified that Krogstad was very active in the management of the business, particularly its financial affairs and that segment of the business that provided temporary draftsmen, designers and engineers to other businesses. Krogstad kept hidden in his home or elsewhere, the personnel and pay records of those employees whose wages and salaries were not reported to the IRS on the false quarterly Form

3. Battaglino testified it was primarily Krogstad.

4. Wages to union employees were customarily paid in cash.

5. Employees whose services to another firm terminated on other than a regular payday would be paid upon such termination.

941's. When an employee or anyone else wanted to examine such records or had any question about them, Krogstad would bring in such employee's individual records for such period of time as was necessary, and then take them back when no longer needed.

Siggia and several employees of Power Flow corroborated portions of Battaglino's testimony. The checks by which Battaglino testified the money for the bribe was obtained were received into evidence. The audit report of Diehl which, with very minor adjustments, accepted the tax reports filed by Power Flow as correct for 1969 and 1970, was also received in evidence. By stipulation, a list of identified employees, totaling 56, none of whom had been reported on the quarterly tax returns for the 6 quarters involved, was submitted into evidence together with their wages and the taxes that were withheld and should have been reported and paid to the IRS.

An IRS agent testified that as a part of the investigation of this case, he reviewed the audit report submitted by Diehl and found it to be "completely wrong." In addition, based on verified records secured from examining W–2 forms received by the employees and comparing them with the tax returns filed by Power Flow, the agent computed the amount of taxes that should have been reported and paid for each of the 6 quarters. Those figures total approximately $46,000 for the last three quarters of 1969 and $76,500 for the first three quarters of 1970, or a total for both years of 122,500.-00.

### III.

The foregoing summary of the Government's evidence excludes testimony concerning conversations between Battaglino and Vetere in which Vetere related conversations between himself and Diehl in respect to the terms of the bribe and Diehl's acceptance of the bribe in return for submitting a false audit report: as noted above, this testimony was received under Federal Rules of Evidence 801(d)(2)(E). Absent such testimony, there is no *direct* evidence that anyone ever offered Diehl a bribe, that Diehl ever agreed to accept a bribe or submit a false audit report, that Diehl ever received any payment from Power Flow or the defendant or anyone else on behalf of Power Flow, or that the audit report as submitted was intentionally false. Nevertheless, there was sufficient *circumstantial* evidence to permit the jury to conclude beyond a reasonable doubt that a bribe was offered, accepted and paid and a false audit report submitted pursuant to the agreement. The evidence is also sufficient to establish that the activities of Krogstad caused, aided and abetted Diehl in knowingly submitting the false audit report.

There is clear and direct evidence that the defendant along with Siggia and Battaglino agreed to pay a bribe to Diehl in order that Diehl submit a false audit report to cover up the false tax returns that had been filed by Power Flow with the knowledge and active participation of the defendant. There is direct evidence that cash was withdrawn in a manner so as to appear as normal payroll for the purpose of paying the bribe. As far as the requisite *mens rea* of Diehl is concerned, there is ample evidence that the audit report submitted by Diehl was at least "completely wrong." The jury had the benefit of reviewing the report, the stipulation that 56 employees were not reported on IRS Form 941's, and that total taxes of about $122,500 for the years 1969 and 1970 were neither reported nor paid. There was also testimony that the audit was conducted behind closed doors with only Vetere present with Diehl. Battaglino testified that he requested Vetere to bribe Diehl. For purposes of this analysis we need not consider Diehl's response.

Diehl was an IRS agent. There was testimony concerning the extensive training which IRS agents undergo, and the qualifications for such a job. The only question in serious dispute for the jury was whether, under all of the circumstances, the errors in the audit report were *knowingly* made by Diehl. This, of course, concerns Diehl's subjective state of mind. State of mind many be ascertained by all of the surrounding

circumstances. We conclude that the jury could properly find beyond a reasonable doubt that Diehl knowingly submitted a false audit report. Therefore, the substantive offense of which Krogstad was charged with causing, aiding and abetting in Count V could be found by the jury based upon sufficient evidence.

Finally, the issue arises as to whether the jury had sufficient evidence to conclude that Krogstad caused, aided and abetted the submission of the false audit report. The case was submitted to the jury on a theory of aiding and abetting, 18 U.S.C. § 2(a). The jury could have justifiably concluded, based on the evidence presented, without considering the co-conspirator statements, that the defendant desired to cause, aid and abet Diehl to submit a false report. Additionally, it should be noted that absent the bribe there would have been no reason for Diehl to have intentionally submitted a false report. Under all of the circumstances, the jury could have reasonably concluded that Krogstad's activities helped bring about the offense by Diehl. Thus, all of the essential elements of Count V could have been found by the jury without in any way considering the conversations that may have taken place between Vetere and Diehl as related by Vetere to Battaglino. There is no reason to conclude that the jury did not conscientiously carry out the district court's instructions to disregard the hearsay admitted under the co-conspirator exception.

## IV.

Defendant contends that Count V is fatally defective for failing to charge that the defendant *knowingly* or *willfully* caused Diehl to submit a false audit report. Count V cites 18 U.S.C. § 1001 and § 2 as the statutes violated. Section 1001 is a broad-based statute prohibiting the submission of false and fraudulent statements to governmental agencies. Count V charges that

Krogstad, Vetere and Diehl caused Diehl to submit a false audit report, but does not specify whether the defendant is charged under 18 U.S.C. § 2(a) or § 2(b). Section 2(a) makes aiding and abetting an offense, and § 2(b) makes it an offense to willfully cause another to so act as to constitute an offense.[6]

Defendant asserts that he was charged under § 2(b) and that such a charge must use the words "willfully cause," citing as authority *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1975). The district court in denying the motion to dismiss Count V held that it would be Diehl's willful conduct that would be controlling, also citing *United States v. Mekjian, supra* at 1324, wherein it was held that a charge under 18 U.S.C. § 1001 must allege willfulness *in haec verba* or by words of similar import.

In *United States v. Catena*, 500 F.2d 1319 (3d Cir. 1974), the defendant was tried for submitting false medicare claims, the indictment charging that he "presented and caused to be presented to an agency of the United States" certain claims in violation of 18 U.S.C. § 287 (a statute closely analogous to 18 U.S.C. § 1001). *Id.* at 1321. The evidence showed that the claims were submitted to the Pennsylvania Blue Shield and Travelers Insurance Company, who in turn processed them for payment by the Government. The Government's theory was that Blue Shield and Travelers were agencies of the United States for purposes of 18 U.S.C. § 287. The court of appeals expressed considerable doubt about this theory, but nonetheless affirmed the conviction on the basis of a violation of 18 U.S.C. § 2(b) because the indictment alleged that the defendant caused the false claims to be presented. The indictment made no express reference to 18 U.S.C. § 2 or §§ 2(a) or 2(b), and it did not allege that defendant willfully caused the submission of the false claims. On the basis of *Catena, supra*, it seems clear that

---

**6.** 18 U.S.C. § 2 provides:

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

the present indictment, which charged that defendant and others caused Diehl to submit a false audit report, and specifically referred to 18 U.S.C. § 2, is sufficient. "Willfulness" need not be expressly stated in the indictment charging a violation of 18 U.S.C. § 2.[7]

The district court submitted the case to the jury on a theory of aiding and abetting under 18 U.S.C. § 2(a). The evidence in this case is sufficient to sustain a conviction under either § 2(a) or § 2(b). If defendant caused Diehl to submit a false audit through a bribe, he likewise aided and abetted Diehl in the commission of the substantive offense. In this case it was proper to allege violation of 18 U.S.C. § 2, and the case was properly submitted to the jury on a charge of aiding and abetting.

## V.

 The final issue is whether under the facts of this case it was fatally inconsistent for the jury to acquit on the conspiracy count and convict on the count which charged causing, aiding and abetting Diehl to submit a false audit. The cases are clear that one may cause another to commit a crime, 18 U.S.C. § 2(b), or aid and abet the commission of a crime, 18 U.S.C. § 2(a), without being a conspirator with the principal offender. *See United States v. Allard*, 458 F.2d 1136, 1139 (3d Cir.), *cert. denied*, 409 U.S. 861, 93 S.Ct. 149, 34 L.Ed.2d 108 (1972); *United States v. Giuliano*, 263 F.2d 582, 585 (3d Cir. 1959). There need be no agreement, express or tacit between the principal offender and the aider and abettor, and indeed the principal offender need not even be aware that he was aided and abetted by another. Thus, in theory at least, there is no necessary inconsistency in convicting on aiding and abetting or causing a crime to be committed by another and an acquittal as to the conspiracy charge. Such a verdict is not necessarily inconsistent in this case. All of the evidence in this case, including defendant's

own testimony, is to the effect that the defendant and Diehl never had any direct contact or communication. The jury did not have to conclude that Diehl was even aware that Krogstad was one of the bribers, or that Diehl knew that anyone other than Battaglino and Vetere were involved in the bribe.

 Even where it is apparent that if one is guilty of aiding and abetting, that person of necessity must also have been a conspirator, the cases are clear that a jury may acquit on the conspiracy and convict on aiding and abetting. *United States v. McCrane*, 527 F.2d 906 (3d Cir. 1975) *vacated on other grounds*, 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (1976); *United States v. Allard, supra.* Consequently, no possible inconsistency gives rise to a basis for a new trial or judgment of acquittal.

The judgment will be affirmed.

---

7. *See United States v. Ehrenberg*, 354 F.Supp. 460 (E.D.Pa.) *aff'd without opinion*, 485 F.2d 682 (3d Cir. 1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974); *United States v. Gerhart*, 275 F.Supp. 443 (D.W.Va. 1967).