**UNITED STATES of America**

v.

**Gordon G. GRUBB and Vincent T. Improto.**

**Crim. No. 78–374.**

United States District Court,
E. D. Pennsylvania.

May 1, 1979.

Frank H. Sherman, Asst. U. S. Atty., Peter F. Vaira, U. S. Atty., Philadelphia, Pa., for plaintiff.

James C. Schwartzman, Philadelphia, Pa., for defendant Grubb.

Thomas A. Bergstrom, Philadelphia, Pa., for defendant Improto.

## MEMORANDUM

CAHN, District Judge.

On December 8, 1978, the grand jury returned a four count indictment charging Gordon G. Grubb and Vincent T. Improto with violations of 18 U.S.C. §§ 2, 371, and 1014. The grand jury charged that the defendants, officers of Teamsters Local 830, made false statements in connection with loan applications submitted to the Teamsters United Brewery Workers Federal Credit Union and the Provident National Bank.

Defendant Grubb has moved to suppress certain evidence which he claims that the government illegally seized; defendant Improto, joined by defendant Grubb, has moved to dismiss Count II of the indictment because of its alleged duplicity; both defendants have moved to have the entire indictment dismissed on the ground of misconduct by the Federal Bureau of Investigation agent assigned to the case (Agent). After considering the evidence presented at hearings held before me on February 15 and March 14, 1979, as well as the briefs and able arguments of counsel, I hold that defendant Grubb's motion to suppress and defendants' Grubb and Improto's motions to dismiss Count II and dismiss the entire indictment must be denied.

## I. MOTION TO SUPPRESS

Defendant Grubb has moved to suppress evidence obtained from:

> any and all banks and/or financial institutions at which Gordon Grubb maintained any sort of business relationship, where such records were obtained without legal process in violation of defendant's rights under the First, Fourth and Fifth Amendments to the United States Constitution.

The evidence and arguments presented to this court at the hearing on February 15, 1979, focused on two specific pieces of evidence: (1) documents (particularly a financial statement submitted by defendant Grubb to the Provident National Bank (Provident)) which allegedly form the basis for Count III of the indictment, and (2) oral statements made by one John Scott Adams, a loan officer at the Provident, to the Agent, which allegedly form the basis for Count IV.

In April of 1978 the Agent served one Marion Stanton[1] with a subpoena duces tecum directed to the "custodian of records or authorized representative Provident National Bank." This subpoena directed that individual to:

> Bring with you all savings, checking, loan or deposit certificate accounts either jointly or singlely [sic] held for Gordon G. Grubb and Louise Grubb from 1972 to the present.

Pursuant to this subpoena loan officer Adams gave the Agent a financial statement which defendant Grubb had submitted to Provident on January 13, 1978. Although Adams was not issued a subpoena for grand jury testimony until August 24, 1978, in April of 1978 the Agent took oral statements from him about defendant Grubb's financial affairs. Both the United States Attorney handling the investigation and the Agent specifically requested that Provident employees not discuss the matter with anyone other than their superiors at the bank.

Defendant Grubb contends that the government abridged his Fourth Amendment rights by obtaining those documents and oral statements. Although Grubb recognizes that under *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Fourth Amendment does not protect documents that he submits to his bank, he suggests that the facts of this case make it distinguishable from *Miller*.

The defendant in *Miller* had moved to suppress records of accounts which he held at two banks. The presidents of these banks had been served with subpoenas duces tecum which ordered them to produce "all records of accounts, i. e., savings, checking, loan or otherwise," of the defendant. 425 U.S. at 437, 96 S.Ct. at 1621. The two banks complied with the subpoenas without informing the defendant. Among the records supplied pursuant to the subpoena were two financial statements which Miller had submitted to one of the banks. The Supreme Court found "that there was no intrusion into any area in which [the defendant] had a protected Fourth Amendment interest," 425 U.S. at 440, 96 S.Ct. at 1622, and held that the district court had correctly denied the defendant's motion to suppress these documents. In reaching this conclusion the Court reasoned that,

> All of the documents obtained, including *financial statements* and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. . . .
>
> .    .    .    .    .
>
> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. . . . This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

425 U.S. at 442–3, 96 S.Ct. at 1624 (citations and footnote omitted, emphasis added). It is clear that *Miller* requires that I deny the defendant's motion to suppress.

Defendant Grubb nevertheless contends that two factors make his case different from *Miller*. First, he argues that the wording of the subpoena is not sufficiently broad to encompass his financial statement and that the government's seizure of that statement is therefore equivalent to a seizure without any process whatever.[2] To

---

1. Marion Stanton was employed by Provident and apparently had no direct contact with Gordon Grubb.

2. It is interesting to note that the wording of the subpoena in question here is very similar to that of the subpoena at issue in *Miller*. The subpoena at issue here, as quoted *supra*, ordered the bank to produce "all savings, checking, loan or deposit certificate accounts .   . ." The subpoena at issue in *Miller*, as quoted *supra*, ordered the banks to produce "all records of accounts, i. e., savings, checking, loan, or otherwise .   . ." 425 U.S. at 437, 96 S.Ct. at 1621. Moreover, in this case loan officer Adams testified that in bank parlance the phrase "loan account" includes the credit file which contains the financial statement.

support his argument he points to footnote seven in *Miller,* where the Court distinguished *Burrows v. Superior Court,* 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974).[3] In *Burrows* the bank had provided statements to the police in response to an informal request rather than, as in *Miller,* in response to compulsory legal process. The *Miller* Court distinguished *Burrows* on that basis.[4] However, distinguishing between statements made in response to informal requests (*Burrows*) and statements made in response to compulsory process (*Miller*) would help defendant Grubb only if he could establish that he had a Fourth Amendment interest in the documents in question. Unfortunately for the defendant, *Miller* makes it clear that he does not.

■ The facts of the case before me are virtually indistinguishable from the facts of *Miller.* In both cases the banks disclosed financial statements when faced with subpoenas ordering the production of "all accounts." In both cases the banks failed to notify the defendants of the issuance of the subpoenas. If Mr. Miller did not have a Fourth Amendment interest in his bank records, neither does Mr. Grubb.[5] Like Mr. Miller, the defendant here "lacks the requisite Fourth Amendment interest to challenge the validity of the subpoenas." 425 U.S. at 446, 96 S.Ct. at 1626 (footnote omitted).[6]

■ Second, Defendant Grubb contends that the oral statements taken from loan officer Adams were obtained without the benefit of any subpoena and must be suppressed. Again the defendant relies on footnote seven in *Miller,* and the court's discussion of *Burrows* which, in the defendant's view, suggests that the validity of the disclosure of bank information depends on compulsion by legal process. Even assuming that the defendant's view of footnote seven is correct, the problem with his argument is that footnote seven refers to bank records, not oral statements. The defendant can point to no case which supports the proposition that a voluntary oral disclosure by a third party, even one in a confidential relationship, violates the defendant's Fourth Amendment rights. Indeed, there is considerable authority to the contrary. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). I decline the defendant's invitation to ignore the importance of these Supreme Court decisions and extend Fourth Amendment protection to voluntary oral disclosures by third persons.

■ Defendant Grubb further contends that it was improper for both the United States Attorney and the Agent to tell the bank employees not to disclose their inquir-

**3.** In footnote seven the Court noted that:

> This case differs from *Burrows v. Superior Court,* 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974), relied on by Mr. Justice Brennan in dissent, in that the bank records of respondent's accounts were furnished in response to 'compulsion by legal process' in the form of subpoenas duces tecum. The court in *Burrows* found it 'significant . . that the bank [in that case] provided the statements to the police in response to an informal oral request for information.' 13 Cal.3d, at 243, 118 Cal.Rptr. at 169, 529 P.2d, at 593.

425 U.S. at 445, 96 S.Ct. at 1625 n. 7.

**4.** It is important to note that the majority opinion in *Miller* discusses *Burrows* in response to Justice Brennan's reliance on *Burrows* in his dissent. See note 3, *supra.* The Court gave no indication that it intended that footnote 7 alter its holding that a depositor has no Fourth Amendment interest in the documents which he reveals to his bank. 425 U.S. at 443, 96 S.Ct. 1619.

**5.** I recognize that *Miller* has been severely criticized, *Search and Seizure,* Vol. 1, p. 409 *et seq.* LaFave (West 1978), and that in *Burrows v. Superior Court,* 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974), the California Supreme Court held that an accused has a reasonable expectation of privacy in his bank statements. Nevertheless, *Miller* represents the law of the land and this court must follow it.

**6.** Even if the defendant could challenge the validity of the subpoena, I would hold that given loan officer Adams' testimony, recounted *supra,* n. 2, the defendant's challenge must fail.

ies to him. The defendant asserts that the government's behavior prevented him from making any attempt to quash the subpoena or otherwise oppose the disclosure and that the evidence thus obtained should be suppressed. However, defendant Grubb cites no cases that support his position. Indeed, footnote five in *Miller* directly contradicts it. In footnote five the Court observed that the bank's failure to notify the defendant that it had received a subpoena for his records was "a neglect without legal consequences here, however unattractive it may be." 425 U.S. at 443 n. 5, 96 S.Ct. at 1624 n. 5. While I am concerned that the Agent and the United States Attorney may have been overzealous, given *Miller,* I cannot hold that their actions violated any of the defendant's constitutional rights. I therefore see no need to suppress the information thus obtained.

Defendant Grubb is correct that as of March 15, 1979, the Right to Financial Privacy Act of 1978, Pub.L. No. 95–630, 92 Stat. 3641 (1978), which was enacted on November 10, 1978, requires that a bank inform its customers that it has received a judicial subpoena for the customer's bank records. Had the subpoena for defendant Grubb's bank records been issued after March 15, 1979, the United States Attorney and the Agent could not have behaved as they did in this case.[7] However, Congress specifically provided that the statute would not take effect until more than four months after its enactment. In the absence of constitutional infirmity with the government's action in this case, I decline to give the legislation retroactive effect.[8]

■ Finally, defendant Grubb argues that suppression is required because he is a target of the Philadelphia labor squad of the Federal Bureau of Investigation and that the government's actions represent an improper inquiry into associational activities and violate his First Amendment rights. Grubb relies on footnote six of *Miller* to support his argument.[9] However,

7. The government's argument that Congress acknowledged the propriety of delaying notification to the bank's customer by enacting § 1109 of the Right to Financial Privacy Act is without merit. That section provides that the government must obtain court approval of any delay in notifying the bank customer. The very existence of this provision shows that Congress did not want the government to make a unilateral decision to delay notification and that is precisely what the government did in this case. Therefore, had the subpoena in question here been issued after March 15, 1979, the government would have had to obtain court approval of its decision to delay notification. It could not have proceeded as it did in this case.

8. The defendant's position also overlooks the argument that even if the actions which form the basis of this motion had taken place after the effective date of the statute, I could not suppress the evidence on that basis. Section 1117 of the Right to Financial Privacy Act of 1978, Pub.L. No. 95–630, 92 Stat. 3641 (1978) (the Act), provides civil penalties for violations of the Act. Furthermore, § 1117(d) provides that "[t]he remedies and sanctions described in this title shall be the only authorized judicial remedies and sanctions for violations of this title." Since title 11 does not explicitly provide for suppression of documents obtained by the government in violation of the Act, it appears that even if the government had been subject to the provisions of the statute when it subpoenaed the documents at issue here, defendant

Grubb would not be able to use the violation as a basis for suppressing the evidence thus obtained. Given that the parties have neither briefed nor argued the issue of the meaning of § 1117, the preceding discussion shall serve only to rebut the defendant's argument that the enactment of the Act amounted to a legislative overruling of *Miller*—had Congress wanted to overrule *Miller* it would have provided for suppression of the evidence as a remedy. The preceding discussion shall not be interpreted as this court's opinion on the issue of whether it would be proper to construe this statute in such a way as to judicially imply the remedy of suppression. That issue is not before me, and I express no opinion on how I would decide it.

9. In footnote six the Court noted that:

Respondent does not contend that the subpoenas infringed upon his First Amendment rights. There was no blanket reporting requirement of the sort we addressed in *Buckley v. Valeo,* 424 U.S. 1, 60–82, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), nor any allegation of an improper inquiry into protected associational activities of the sort presented in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).

We are not confronted with a situation in which the Government, through 'unreviewed executive discretion,' has made a wide-ranging inquiry that unnecessarily 'touch[es]

there is no evidence that the inquiry here is related to anything other than improper financial dealings by union officials. There has been no effort to chill Grubb's right to political expression, nor has there been an inquiry into any "intimate areas of an individual's personal affairs." 425 U.S. at 444 n. 6, 96 S.Ct. at 1625 n. 6, *quoting California Banker's Ass'n. v. Shultz,* 416 U.S. 21, 78–79, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). Rather, as in *Miller,* "the Government has exercised its powers through narrowly directed subpoenas duces tecum subject to the legal restraints attendant to such process." 425 U.S. at 444 n. 6, 96 S.Ct. at 1625 n. 6. The inquiry has been limited to the defendant's banking transactions and that subject matter is neither privileged nor protected under federal law.

## II. MOTION TO DISMISS COUNT II OF THE INDICTMENT

■ Defendant Improto, joined by defendant Grubb, has moved to dismiss Count II of the indictment on the ground that it is impermissibly duplicitous. Count II charged the defendants with violations of 18 U.S.C. §§ 2 and 1014. Section 1014 proscribes the making of false statements on a loan application. Section 2 provides that:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The defendants have taken the position that since Count II does not specify whether they are being accused of violating § 2(a) or § 2(b) Count II is duplicitous and therefore violates Rule 8(a) of the Federal Rules of Criminal Procedure. The defendants argue that § 2(a) and § 2(b) describe different offenses and that the government's failure to specify which subsection the defendants allegedly violated will subject them to double jeopardy and allow the jury to convict them by less than a unanimous verdict.

The defendants' arguments rest on the unarticulated assumption that § 2 describes a substantive crime. However, it does not. Section 2 describes the kinds of individuals who can be held responsible for a crime; it defines the degree of criminal responsibility which will be attributed to a particular individual. The nature of the crime itself must be determined by reference to some other statute. Without a violation of some other statute there can be no violation of § 2. Thus, § 2 alone defines no crimes.

In apparent recognition of this difference between § 2 and statutes which describe substantive crimes, the court of appeals has held that a defendant can be convicted of violating § 2 even when the indictment does not mention § 2 at all.[10] *United States v. Catena,* 500 F.2d 1319, 1923 (3d Cir.), *cert. denied,* 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 641 (1974). It follows inexorably that specific reference to § 2 cannot result in dismissal of the count, and the court of

upon intimate areas of an individual's personal affairs.' *California Bankers Assn. v. Shultz,* [416 U.S.] at 78–79, 94 S.Ct. 1494, 39 L.Ed.2d 812 (Powell, J., concurring). Here the Government has exercised its powers through narrowly directed subpoenas duces tecum subject to the legal restraints attendant to such process. See Part IV, infra. 425 U.S. at 444, 96 S.Ct. at 1625 n. 6.

**10.** The difference between § 2 and statutes which describe substantive crimes also makes this case distinguishable from *United States v. Starks,* 515 F.2d 112 (3d Cir. 1975). In that case the defendant had been accused in a one count indictment of having both conspired and attempted to violate the Hobbs Act, 18 U.S.C. § 1951, and the court of appeals found that the indictment was duplicitous because it charged both conspiracy and attempt in the same count. However, conspiracy and attempt are two different substantive offenses. By contrast § 2(a) and § 2(b) merely describe which individuals may be punished as principals. Neither § 2(a) nor § 2(b) describes a substantive offense. It only defines the status of individuals who are involved in a criminal act.

appeals has so held.[11] *United States v. Krogstad,* 576 F.2d 22, 28–29 (3d Cir. 1978).

In *Krogstad* the court of appeals upheld the conviction of an individual who had been charged with violating 18 U.S.C. §§ 2 and 1001 in a single count. Although the indictment did "not specify whether the defendant [was] charged under 18 U.S.C. § 2(a) or § 2(b)," the court found that "[t]he evidence in this case is sufficient to sustain a conviction under either § 2(a) or § 2(b)." It therefore affirmed the conviction.[12] 576 F.2d at 28–29. If the simple allegation of a violation of § 2 could serve as the basis of the conviction in *Krogstad,* it could not serve as the basis for dismissing Count II of the indictment in this case.

■ The defendants also argue that the government's failure to allege that they "willfully" violated § 2(b) requires dismissal of Count II because "willfulness" is an essential element of a § 2(b) violation. Absent an allegation of "willfulness," their argument runs, the count cannot state an offense. The court of appeals addressed and rejected that argument in *Krogstad.* In that case the court stated that, " '[w]illfulness' need not be expressly stated in the indictment charging a violation of 18 U.S.C. § 2." 576 F.2d at 29. Therefore, the argument fails and the defendants' motion to dismiss Count II of the indictment must be denied.

### III. MOTIONS TO DISMISS THE ENTIRE INDICTMENT

■ Both defendants have also moved to dismiss the indictment because of what they allege to have been misconduct by the Agent who was assigned to the case. They assert that the Agent threatened prospec-

11. Even if the defendants were correct in their argument on the duplicity issue, their motion to dismiss would have to be denied; in *Starks* the court held that ordering the government to file a bill of particulars in which it elected the section that it would proceed under was an adequate remedy for duplicity.

12. Notwithstanding that the indictment had alleged a violation of § 2 in general the district court had charged the jury on § 2(b) only.

tive witnesses and thereby infringed the defendants' Sixth Amendment right to compulsory process. On March 14, 1979, the court conducted a hearing to determine the merits of those allegations. The defendants presented witnesses who testified that the Agent had contacted them to find out if they had spoken to defense investigators and to ask them to request copies of any statements prepared by the defense investigators as a result of those interviews. Some of the witnesses testified that the Agent cautioned them that those statements could be used in cross examination to confuse them and make them look untruthful.

The Agent also testified at that hearing. He stated that it was his standard practice to call individuals whom he had previously interviewed to keep tabs on their whereabouts and to find out if defense counsel had tried to contact them. The Agent explained that he usually asked a prospective witness to obtain copies of any statements given to defense investigators so that the government could review the statements.

The defendants take the position that the Agent's conduct violated their Sixth Amendment rights. The defendants cite several cases in support of the proposition that the government's intimidation of prospective witnesses violates a defendant's Sixth Amendment rights. *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976). However, these cases do not support the proposition that such a violation commands dismissal of the indictment. *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976).

Thus, it was clear that he was convicted of violating § 2(b) specifically. Although the nature of the district judge's charge does not seem to have been crucial to the court of appeals' decision, this court will allow the defendants to request that the court charge the jury on either § 2(a) or § 2(b) at the conclusion of their defense. The choice of which, if any, of the subsections the jury should be charged under will be based on the evidence presented.

In this case the witnesses have neither refused to testify nor indicated that the Agent's conduct will affect the content of their testimony. No witnesses have been "driven from the stand." *Compare Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). Indeed, the witnesses called defense counsel immediately after having spoken with the Agent and were willing to testify in open court at the hearing on this motion. In the absence of prejudice to the defendants, the Agent's conduct, while overzealous, does not necessitate dismissal of the indictment.

This result follows directly from *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976). In that case the prosecutor interviewed the key defense witness and "informed her of her rights" by telling her that she could be prosecuted for perjury and that what she said could be used against her in a state court prosecution, or, in special circumstances, even in federal court. The witness was a friend of the defendant's who had been indicted with him but whose case had been dismissed when it was discovered that she had been under eighteen years of age at the time of the offense. She was going to testify that it was she, and not the defendant, who had committed the offense for which the defendant was being prosecuted. After the prosecutor spoke to her, she took the stand and testified "intelligently" to many questions but she asserted her Fifth Amendment privilege and refused to answer some thirty of defense counsel's questions. After conducting a hearing at which the foregoing facts were put into evidence, the trial judge denied the defendant's motion for a mistrial and later, his motions for judgment of acquittal and a new trial. The court of appeals held that the prosecutor's actions required that the defendant receive a new trial. Nevertheless, the court observed that although the prosecutor's actions were "not to be condoned," prejudice to the defendant could be avoided by providing that on retrial the government grant immunity to the witness in question. Therefore, the court refused to issue a judgment of acquittal.

In this case there is no evidence that the Agent threatened or intimidated any of the prospective witnesses prior to their conversations with the defense investigators or that the Agent prevented the defense from obtaining statements from any of the prospective witnesses.[13] The defendants have not shown that the Agent's actions have or will prevent them from obtaining the testimony of these witnesses. Indeed, the witnesses in question testified at the hearing on this motion. If the actions of the prosecutor in *Morrison* did not require the entry of a judgment of acquittal, the actions of the Agent in this case cannot require the dismissal of this indictment. In *Morrison* the court demonstrated that as long as any possible prejudice to the defendant can be overcome, there is no need to issue a judgment of acquittal. In this case, where there is no evidence of prejudice to the defendants at all, there can be no need to dismiss the indictment.

I want to make it clear that this court neither approves of nor condones the actions of the Agent in this case. It is conceivable that his activities could frighten less hardy witnesses. This court therefore admonishes him to refrain from making statements that could be construed as chilling a witnesses' right to communicate with defense counsel. Moreover, I wish to make it clear that my denial of the defendants' motion to dismiss the indictment is based only on the state of the record before me at this time. It does not prejudice the defend-

---

13. The American Bar Association's *Standards Relating to the Prosecution Function and the Defense Function,* § 3.1(c) (*Standards*), which the defendants cite in support of their motions actually serve to justify the Agent's actions in this case. The *Standards* provide that "[i]t is proper to call the attention of the witness to the problem of subscribing to a statement prepared by another person." Although the *Stan-* dards provide that "it is improper for a prosecutor, defense counsel, or anyone acting for either to suggest to a witness that he not submit to an interview by opposing counsel," there is no evidence that such a suggestion was made to prospective witnesses in this case. In any event, the mere fact that such conduct is improper does not mean that, without more, it commands dismissal of the indictment.

ants' right to make any other motions which they deem appropriate in the event that they discover other relevant evidence.