**UNITED STATES of America**

v.

**Walter MORRISON a/k/a "Skip" Morrison, et al.**

**Appeal of Nick BOSCIA.**

**No. 75–2060.**

United States Court of Appeals, Third Circuit.

Submitted Jan. 15, 1976.

Decided April 27, 1976.

As Amended June 3, 1976.

---

3. Erie is 30 miles from Meadville while Youngstown is 45 miles away.

Blair A. Griffith, U. S. Atty., James A. Villanova, James J. West, Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Joel S. Perr, Perr, Ziegler & Ombres, Pittsburgh, Pa., for appellant.

Before GIBBONS, FORMAN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

Appellant Nick Boscia was found guilty after a jury trial on two counts, conspiracy to distribute and distribution of approximately 856.5 grams of hashish in violation of 21 U.S.C. §§ 841(a), 846.

The only issue on appeal is whether appellant was denied a fair trial in that he was deprived of his constitutional right to call witnesses in his defense by the actions of Mr. Villanova, the Assistant United States Attorney. The trial judge heard sworn testimony, out of the presence of the jury, from the lawyers for the defendants (Mr. Boscia was tried with two co-defendants; other indicted conspirators pled guilty), and from Mr. Villanova. Though clearly troubled by the case and terming the actions of the Assistant United States Attorney "improper," the judge denied a

motion for mistrial made during the trial and motions made after trial for judgment of acquittal or alternatively for a new trial.

## I

The story that emerges from study of the record, including the testimony given at the evidentiary hearing, is that defendant, Mr. Boscia, and his lawyer planned his defense around the testimony of Sally Bell, Mr. Boscia's girl friend, who allegedly was prepared to swear that it was she and not Mr. Boscia who had been involved in the conspiracy to sell hashish. As the pair told the story to Joel S. Perr, Esq., Mr. Boscia's court-appointed lawyer, Mr. Boscia's involvement was minimal and incidental and he decided to reject the plea negotiations and go to trial. Ms. Bell was originally indicted with Mr. Boscia and others but charges were dropped against her when it was disclosed that she had been under eighteen years at the relevant time. She seems to have understood that with the dropping of federal charges she was free from prosecution for her role in the conspiracy. This, however, was not true. Under 18 U.S.C. § 5032 she could still be charged as a juvenile in state court, which is now the usual forum for all federal juvenile offenders, and if the state declined to prosecute her, she could be prosecuted by permission of the United States Attorney General in the federal court.

On the morning that the trial commenced, Monday, April 14, 1975, Ms. Bell assured defense counsel that she was willing to testify. Mr. Boscia's lawyer, not sure of the status of the charges against her but aware there might be conflict between her interest and that of his client, requested the court to appoint counsel for her or grant her immunity. This was opposed by Mr. Villanova. He stated that he was not going to call Ms. Bell and, should the defense do so, a warning by the court of her rights would be sufficient protection.[1] The judge said the court would instruct her on her rights, but expressed doubt as to whether he could appoint counsel for a witness or grant immunity except on motion of the Government.[2]

During the next few days Mr. Villanova appears to have had a change of mind as to the protection he considered that Ms. Bell needed. On at least three occasions he sent messages to her through defense counsel warning that she was liable to be prosecuted on drug charges; that if she testified, that testimony would be used as evidence against her and, further, that as she was now eighteen it would be possible to bring federal perjury charges against her.[3] Not content that these messages would adequately alert her to her peril, he sent a subpoena to Ms. Bell and had her brought into his office on Wednesday, April 16.[4] The subpoena would not appear to have had any legal validity as it was made out for a day already past. Originally addressed to Mike McBride, his name had been scratched out and Sally Bell's inserted instead. The only purpose of the subpoena would therefore seem to have been to impress Ms. Bell

---

1. Transcript at 4.

2. Transcript at 4–7.

3. Transcript at 303, 306, 350–1, 351–2, 371.

4. Appellant's brief states (pp. 5–6) that Mr. Villanova subpoenaed and interviewed Ms. Bell on the morning of Thursday, April 17; that this occurred after the Government had rested its case (Wednesday, April 16), and immediately before she was called to the stand to testify; that at the interview she was asked "what testimony she would offer *that* morning to the jury" (emphasis added); and that court was called to order and Sally Bell to the witness stand as first defense witness immediately after this interview. The Government's brief fails to

challenge the accuracy of this timing of the questioning of Sally Bell by Mr. Villanova. However, the record shows that Mr. Villanova, at the evidentiary hearing held immediately after Sally Bell's testimony on the morning of April 17, stated "I talked to her in our office *yesterday* (emphasis added) and advised her of her rights." (Transcript at 377). It is also clear from his examination of Ms. Bell at the evidentiary hearing that the interview had taken place the previous day (Transcript at 389). The District Court accepted Mr. Villanova's testimony as true. We also accept it as true and reject as inaccurate the statement of facts in pp. 5, 6 of Attorney Perr's brief for Mr. Boscia.

with the force of the law with with she was entangling. There, surrounded by the three law-enforcement officers who had served as undercover agents in the case and whose testimony Sally Bell was meant to undermine in court, he once again impressed upon her the dangers of testifying.

At this interview Mr. Villanova, according to his testimony, advised Ms. Bell of her rights. He testified that

"Some of the rights I couldn't remember myself, even though I'm an attorney, and the police officers told me what to tell her as far as her rights, her right not to testify, not to say anything to me, her rights to have an attorney present, her right to remain silent even after she said something. . . . I told her that if she admitted she was part of this thing that she could in fact be prosecuted as a juvenile in state court, and I told her that if she could not be prosecuted as a juvenile in state court that she could be prosecuted possibly, with the permission of the attorney general, as a juvenile in federal court, and I told her that she should know that before she went up to the witness stand and confessed.

"I also told her that if she testified falsely that she could subject herself to a perjury charge, and I told her that even though the charges were dismissed against her as an adult on the dope charge itself, that if she testified falsely she was now an adult over 18, and if we could prove it, and she was testifying falsely on behalf of Nick Boscia thinking to get her to lie to exculpate himself and get off the hook, she could be prosecuted for perjury, and she should know that." Transcript at 377–9.

Ms. Bell seems to have felt increasingly intimidated under this barrage of warnings.[5] When she was called to the stand on the morning of Thursday, April 17, though she answered many of the questions fully and intelligently, there were more than thirty questions which she refused to answer on the ground that the answers might incriminate her, thus depriving appellant of much of the evidence he had expected to place before the jury. After Ms. Bell's testimony, Judge Knox held the before-mentioned evidentiary hearing at which the defense attorneys, Mr. Villanova and Ms. Bell testified under oath.

## II

The Supreme Court has stated:

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14 at 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967).

This right is found specifically in the Sixth Amendment right to compulsory process.[6] A recent commentator[7] has traced the development of the compulsory process clause finding that at the time of its adoption it stood for the principle that "a defendant should have a meaningful opportunity, at least on a par with that of the prosecution [8] to present a case in his favor

5. Mr. Perr testified: "Now, on late Tuesday Miss Bell indicated to me that she felt intimidated by the remarks and she was getting to a point where she was scared to testify." Transcript at 352.

6. In *Washington v. Texas*, the Supreme Court held that the right is so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment. Some cases since then have been based

on the Due Process Clause without reference to the Sixth Amendment e. g. *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972).

7. Westen "The Compulsory Process Clause" 73 Michigan Law Review 71 (1974).

8. The District Court pointed out to Mr. Villanova, "If a defense counsel would go to a witness you would want to go to a grand jury about it." Transcript at 386.

through witnesses." Mr. Boscia alleges that the actions of Mr. Villanova denied him this right. We agree.

The grounds on which the District Court denied Mr. Boscia's motions were that Mr. Villanova's actions were done in good faith, did not cause any substantial prejudice to Mr. Boscia and did not deprive him of any right to which he was entitled. We believe that the Supreme Court decision in *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) stands directly in the way of the District Court's conclusion and must control this case.

In *Webb*, the Supreme Court reversed the Texas Court of Criminal Appeals and found the defendant had been denied due process where the trial judge gratuitously and unnecessarily singled out the defendant's only witness for a lengthy admonition on the dangers of perjury, assuring the witness that if he lied he would be prosecuted and probably convicted of perjury, that the resulting sentence would be added onto the one he was serving and impair his chances of parole. After this warning, the witness had refused to testify and was excused by the court.

The District Court sought to distinguish *Webb* on the grounds that the witness in that case had been driven from the stand by the judge's warning whereas Sally Bell testified freely to non-incriminating matters before the jury and testified out of jury hearing on the conversation she had with Mr. Villanova. We do not find these distinctions relevant to the issue of whether the actions of the prosecutor interfered with Mr. Boscia's right to have his witness give evidence in his favor.

The District Court found that the remarks of Mr. Villanova were the cause of Sally Bell's choice not to incriminate her-self.[9] Such a finding would seem indeed mandated by the burden of proof established for such a question in *Webb*. There the Texas Court of Appeals had held there was no showing that the witness had been intimidated by the admonition or refused to testify because of it. The Supreme Court disagreed, 409 U.S. at 97, 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333. It said:

"The fact that Mills was willing to come to court to testify in the petitioner's behalf, refusing to do so only after the judge's lengthy and intimidating warning, strongly suggests that the judge's comments were the cause of Mills' refusal to testify. . . .

"In the circumstances of this case, we conclude that the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment."

The actions of the prosecutor in his repeated warnings which culminated in a highly intimidating personal interview were completely unnecessary. A warning of rights by the court prior to Sally Bell's testimony would be adequate protection against an unknowing waiver of her right against self-incrimination, and the District Judge stated on the first day of trial that he would give such a warning. The good faith of the Assistant United States Attorney would be relevant if *he* were charged with violation of 18 U.S.C. § 1503 which makes the intimidation of a federal witness a criminal offense. It is not, however, relevant to an inquiry into whether a *defendant* was denied his constitutional right.

Nor does the opinion of the District Court that "corroboration of Boscia's story by Sally Bell could not have affected the verdict"[10] excuse the infringement of Mr.

---

**9.** "The court observes that although *the remarks by the Assistant United States Attorney did cause Sally Bell to choose not to incriminate herself,* she was not so intimidated as to refuse to report these matters to the court and to testify as to the conversation that she had had with the Assistant United States Attorney.

Likewise she testified to the jury as to many relevant matters . . . ." Unpublished opinion filed 8/12/75 at pp. 7–8 (emphasis added).

**10.** Opinion at 10.

228

Boscia's rights. The District Court states that Boscia had "admitted every element of the crime charged except intent and had admitted a great deal of facts from which the jury could infer intent." Mr. Boscia still had the right to put before the jury facts to contradict that intent. Prior to trial the District Court had refused to accept a guilty plea from Mr. Boscia because there was insufficient basis for the plea on the facts that Boscia would admit.[11]

■ In *Webb* the defendant had been surprised during an armed robbery and held by the wounded victim at gunpoint till the police arrived. As Justice Blackmun's dissent, in which Justice Rehnquist joined, points out, there was "overwhelming evidence of guilt", 409 U.S. at 99, 93 S.Ct. at 354, 34 L.Ed.2d at 334. But the majority of the Court ignored that fact, apparently finding it irrelevant, and reversed the conviction as an infringement of the petitioner's due process rights. *Accord U. S. v. Thomas,* 488 F.2d 334, 336 (6th Cir. 1973). Thus where the Government has prevented the defendant's witness from testifying freely before the jury, it cannot be held that the jury would not have believed the testimony or that the error is harmless.

■ Although as a general rule there is no duty to advise a *witness* in court or at a grand jury proceeding of his right not to incriminate himself, 97 C.J.S. *Witnesses* § 44 (1957); *U. S. v. Luxenberg,* 374 F.2d 241 (6th Cir. 1967), it is entirely proper for the court in its discretion to issue such warnings. In this case, the defense counsel had raised the problem with the court at the very opening of trial. The court had said it would instruct Sally Bell on her rights and did in fact do so at the appropriate time.[12] The actions of Mr. Villanova were totally unnecessary. Ms. Bell could have made a knowing choice of whether to testify or not on the basis of the formal warning from the court. The pressure brought to bear on her by the Assistant United States Attorney interfered with the voluntariness of her choice and infringed defendant's constitutional right to have her freely-given testimony.

This case seems clearly ruled by *Webb.* True, it was the trial judge in that case who "effectively drove that [the defendant's] witness off the stand." 409 U.S. at 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333. Here, it was the influence of the Assistant United States Attorney, Mr. Villanova, a figure somewhat lower in the hierarchy than the trial judge but nonetheless the symbol of the Government's power to prosecute offenders. However good the trial judge found the intentions of Mr. Villanova, his bizarre conduct toward a witness for the defense is not to be condoned. It was without doubt responsible for the course pursued by Sally Bell in refusing to testify and to that extent deprived Mr. Boscia of due process of law under the Fourteenth Amendment. Under such circumstances the order of the United States District Court for the Western District of Pennsylvania filed August 12, 1975 denying the motion for a new trial will be reversed.

### III

There remains the question of whether a fair trial of Mr. Boscia can now be held or whether the harm done by Mr. Villanova's actions is irreparable.[13]

■ When defense counsel at the opening of the trial, before any untoward circumstance had occurred, requested immunity for Sally Bell, the District Court correctly stated that immunity is granted only at the request of the United States. 18 U.S.C. § 6003 empowers the District Court to grant immunity "upon the request of the United States attorney for such district." The conflict between the right of a defendant to produce evidence in his favor and the right of witnesses not to incriminate themselves has been raised in many cases when a

11. Transcript at 360.

12. Transcript at 309–10.

13. Judge Knox during the evidentiary hearing stated "One of the things I wonder about is if a fair trial can ever be held in this case." Transcript at 386.

defendant has sought to obtain immunity for his witness. The courts have invariably held that they lack power to grant immunity except on request of the Government. *U. S. v. Berrigan,* 482 F.2d 171, 190 (3d Cir. 1973); *U. S. v. Allstate Mortgage Corp.,* 507 F.2d 492 (7th Cir. 1974), *cert. den.* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666.

The rationale for this unavailability of immunity to a witness at the defendant's request has been characterized thus: "A person suspected of crime should not be empowered to give his confederates an immunity bath." *In re Kilgo,* 484 F.2d 1215, 1222 (4th Cir. 1973). However, 18 U.S.C. § 6002 does not provide an "immunity bath" for witnesses but merely provides "use immunity," so that no testimony compelled by the grant of immunity, nor any information directly or indirectly derived from such testimony, may be used against the witness in a subsequent prosecution other than for perjury. The Supreme Court in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) held that a grant of use immunity affords adequate protection of a witness' right not to incriminate himself and enables the Government to compel the witness to testify.

█ There are circumstances under which it appears due process may demand that the Government request use immunity for a defendant's witness. See *dicta* in *U. S. v. Leonard,* 161 U.S.App.D.C. 36, 494 F.2d 955, 985 n. 79 (1974) (concurring and dissenting opinion of Bazelon, C. J.); and *Cf. Earl v. U. S.,* 124 U.S.App.D.C. 77, 361 F.2d 531, 534 n.1 (1966) (Burger, J.). Such a circumstance was created in this case when prosecutorial misconduct caused the defendant's principal witness to withhold out of fear of self-incrimination testimony which would otherwise allegedly have been available to the defendant.

At the new trial, in the event that the defendant calls Sally Bell as a witness, if she invokes her Fifth Amendment right not to testify, a judgment of acquittal shall be entered unless the Government, pursuant to 18 U.S.C. §§ 6002, 6003, requests use immunity for her testimony.

ROSENN, Circuit Judge (dissenting).

The Assistant United States Attorney may have acted imprudently and perhaps reprehensibly in his conference with Sally Bell, but I do not believe his actions denied the defendant Boscia a fair trial. A defendant has the right to have his witnesses testify free from intimidation. A defendant, however, may not complain when his witness freely exercises the privilege to plead the fifth amendment. I, therefore, respectfully dissent.

Sally Bell was originally indicted with Boscia and others, but the charges against her were dismissed at the instance of the Government when it was discovered that she was under eighteen years of age at the time of the alleged offense. She apparently understood that with the dropping of the federal charges, she was relieved from prosecution for her role in the conspiracy. As the majority point out, "[t]his, however, was not true. Under 18 U.S.C. § 5032 she could still be charged as a juvenile in state court, which is now the usual forum for federal juvenile offenders, and if the state declined to prosecute her, she could be prosecuted by permission of the United States Attorney General in the federal court." Majority Opinion, p. 225.

Sensing that the defense strategy was to unload all responsibility for the alleged violations upon Ms. Bell, the indictment against her having been dismissed, and knowing she was without counsel, Mr. Villanova, the Assistant United States Attorney, sent her messages through Boscia's counsel, Mr. Perr. The exact language of the messages is in dispute, but the gist was that the dismissal of the indictment against Ms. Bell was not necessarily a final disposition of her case. Mr. Villanova further informed Mr. Perr that he expected the state court to proceed against Ms. Bell as a juvenile; that, absent such prosecution, he would seek permission from the Attorney General to prosecute her in the federal court; and that since she was now eighteen years of age, if she took the stand in behalf of the defense and lied, she could be prosecuted for perjury.

The Assistant United States Attorney became concerned that Boscia's lawyer had not passed this information on to Ms. Bell.[1] He thereupon had her brought to his office under subpoena at the close of the Government's case and, in the presence of several law enforcement officers, personally advised her of her rights and of the perils of testifying falsely. Despite these admonitions and any feelings of intimidation which she may have had at that time,[2] she appeared in court in behalf of the defense. Upon being sworn, the following colloquy took place between her and the trial judge:

THE COURT: Miss Bell, it is my duty to warn you that under the Fifth Amendment of the United States Constitution you cannot be compelled to testify to any matters that you feel might incriminate you, and therefore, on those matters you would have a right to remain silent. If, however, you elect to testify, anything you say might be used against you in court. You do have the right to have an attorney advise you if you wish to testify or not.

SALLY BELL: Yes, sir, I'll testify.

THE COURT: Do you want an attorney?

SALLY BELL: No.

Ms. Bell thereupon testified for the defense. An examination of the transcript of her testimony reveals that she responded to questions of counsel and court "fully and intelligently."[3] She selectively refrained from answering any questions which she thought might incriminate her.

Under these circumstances, I cannot agree with the majority that the repeated warnings of the Assistant United States Attorney to Ms. Bell, culminating in his personal interview with her, had any intimidating effect upon her. She appeared in court for the defense; she testified for the defense, and when she refused to respond to certain questions, she was exercising her fifth amendment privilege precisely as she was instructed in court by the trial judge.

This young lady was obviously a perceptive, bright, and alert witness. The testimony she did give disclosed that she had considerable information about the alleged conspiracy and that she also might have been involved as a principal. For example, she testified readily as to the arrangements made on June 26, 1974, at the McBride (a co-defendant) apartment, for purchase of hashish at Penn State by Malloy. She gave the names of those who were present and who were to drive Malloy there to make the purchase. She also testified on direct examination that she knew what was to take place at State College but, when asked how she knew, she replied, "I'll take the Fifth Amendment."

She further testified that the defendant Boscia was present when the arrangements were made and that she was present when Boscia returned that evening from State College. Notwithstanding her fifth amend-

---

1. As the case unfolded, there was ample basis for his concern. At the evidentiary hearing conducted by the trial judge out of the presence of the jury, Ms. Bell testified:

BY MR. VILLANOVA:
Q.: You are still under oath. Now, Miss Bell, did you realize before I told you yesterday that if you testified and in effect confessed to some implications that you had in this yourself, did you realize that you were subject to any future prosecution on this?
A.: No, sir. It was my understanding that all the charges were dropped and that was on the state and federal level.
Q.: Let me ask you this.
THE COURT: I don't think she finished.
THE WITNESS: That was all.
THE COURT: All right. Go ahead.
BY MR. VILLANOVA:

Q.: Continue.
A.: And I didn't think these charges could be brought up again, the same charges against me.
Q.: You didn't know that the federal government has the power to prosecute people as juveniles?
A.: It was my understanding that they were dropped completely and it wasn't going to go to the state level or federal level.

2. Although the majority opinion suggests that Ms. Bell "felt increasingly intimidated" partly as a result of the interview with Villanova (p. 226), Perr's testimony was that she expressed feelings of intimidation the day before the interview, not thereafter.

3. See majority opinion, p. 226.

ment plea, when Mr. Perr asked her whether Boscia told her what had in fact occurred at State College that evening, she replied affirmatively as follows:

A.: Mr. Upton and Mr. Ramsley and Mike McBride and Nick Boscia drove up.

Q.: Drove where?

A.: To State College, Pennsylvania, and they met Skip—Walter Morrison, and Mr. Upton and Mr. Ramsley purchased the hashish, and they drove back. They came back.

Intimidation, especially in the context in which the term is used under the facts of this case, is not a mechanistic process in which equal pressures applied to different persons achieve identical results. Pressures which overawe the weak or sear the sensitive may be hurled aside by the strong or totally disregarded by the dullard. The extent if any, to which the pressure is effective depends upon the response of the person to whom it is directed. At issue, therefore, is the reaction of the witness under the force of the alleged pressure.

I see nothing in Ms. Bell's conduct or testimony which reveals fright or any semblance of intimidation on her part. She impresses me as an intelligent and strong personality. Only when she thought her testimony might incriminate her personally did she refuse to respond. The district court made no finding that she was intimidated. The district court's observation (see note 9, majority opinion) that Ms. Bell chose not to incriminate herself because of the remarks of the Assistant United States Attorney does not mean that she was acting under coercion or intimidation. She gave her testimony self-reliantly and under the protective arm of the court. Moreover, she could not state that she would not have taken the fifth amendment even if Mr. Villanova had not warned her.[4]

I find *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), distinguish-able. In that case, the defendant's only witness refused to testify and did not take the stand after a lengthy admonition by the trial judge on the dangers of committing perjury and its possible effect on his current prison sentence and parole. The judge in that case threatened the witness when called by telling him that "[i]f you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got. . . ." In the instant case, however, there was merely an admonition; it was not by the trial judge, not in court, and in fact, the witness did not refuse to testify. She testified at length and freely. She rejected the court's offer of a lawyer to advise her.

The focus of the Court's concern in *Webb* was that "in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a voluntary choice whether or not to testify." *Id.* at 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333. In the case sub judice, a judge did not exert pressure on the witness; on the contrary, he used his office to provide her every opportunity to testify freely. The witness was not driven from the stand; she took it willingly and gave testimony freely.

I do not discern any denial of a fair trail to the defendant. The evidence of his guilt is overwhelming. I would affirm the judgment of the district court.

---

4. At the evidentiary hearing, Ms. Bell testified, in response to a question from Mr. Villanova as to whether she would not have taken the fifth amendment regardless of his warnings to her, knowing as she now did, that she was opening herself up "to juvenile prosecution and so forth,"

A.: I don't know. I am not sure right now. I would have to think about it.