**UNITED STATES of America, Plaintiff,**

v.

**Maurice SMITH, Defendant.**

**No. Cr-3-82-28.**

United States District Court, S.D. Ohio, W.D.

Nov. 21, 1983.

James A. Wilson, Sr. Asst. U.S. Atty., Dayton, Ohio, for plaintiff.

Louis I. Hoffman, Dayton, Ohio, for defendant.

## DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO DISMISS INDICTMENT; INDICTMENT DISMISSED; TERMINATION ENTRY

RICE, District Judge.

The pending motion by Defendant Maurice Smith to dismiss the indictment in this case presents important and difficult questions concerning the rights of defendants at trial and the proper scope of police investigative methods in our criminal justice system. For the following reasons, the Court sustains Defendant's motion, and will dismiss the indictment against him.

On June 22, 1982, an indictment was returned in federal court charging Defendant with four counts of unlawfully acquiring and possessing federal food stamps, in violation of 7 U.S.C. § 2024(b)(1). Trial before a duly empaneled jury commenced on September 7, 1982, and when the jury was unable to reach a verdict on September 15, 1982, this Court declared a hung jury. Defendant's principal defense at trial had been that he was entrapped by the actions of an undercover City of Dayton policeman, one D.R. Hopper. At least two of Defendant's witnesses at trial, William Looney and Crystal Hidgon, contradicted certain testimony of Hopper. On September 15, 1982, Defendant moved to dismiss the indictment (even before the jury had completed its deliberations), due to prosecutorial misconduct. Defendant's allegations of misconduct were premised on various police officers having contacted and interviewed Looney, Higdon, and other persons, after their testimony but while the federal court trial was still ongoing.

Meanwhile, Defendant was indicted in state court on a charge of bribery of a police officer. As herein, Defendant moved in that court to dismiss the indictment for prosecutorial misconduct, since he had intended to call Looney and Higdon, among others, at the state trial which was scheduled to be held subsequent to the federal litigation. Judge John M. Meagher sustained the motion, holding that Defendant's due process rights had been violated, since the police actions had sufficiently intimidated and harassed Looney and Higdon so that they would refuse to testify freely (or to testify at all) at the state trial. *State of Ohio v. Smith*, No. 82–CR–1130 (Common Pleas Ct. Montgomery Co., Ohio Jan. 27, 1983). Judge Meagher's decision was recently affirmed on appeal. No. 8228 (Ct. App. Montgomery Co., Ohio Oct. 25, 1983).

Both Looney and Higdon testified at a hearing held on the motion to dismiss before Judge Meagher.

This Court held evidentiary hearings on the motion to dismiss in April and June of this year. Crystal Higdon, while subpoenaed, did not appear to testify at the hearing. Oral argument was heard on Defendant's motion on October 14, 1983.

Before addressing the substance of Defendant's motion, the Court will examine a threshold issue, whether Crystal Higdon's testimony at the *state* court hearing can be considered by *this* Court in disposing of Defendant's motion to dismiss the indictment. Having concluded that her testimony can be used, the Court will consider whether the allegations of police misconduct and prejudice to the Defendant warrant dismissal of the indictment in this case.

## I. USE OF CRYSTAL HIGDON'S TESTIMONY

■ Depositions or transcripts of prior testimony can be read in criminal hearings or trials, if the witness is "unavailable" as defined by the Federal Rules of Evidence. Fed.R.Crim.P. 15(e). Fed.R.Evid. 804(a)(5), in turn, states that a witness can be considered "unavailable" if the witness

is absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means.

For the purpose of this case, if the witness is found to be unavailable, then the former testimony could be considered in a present proceeding under the hearsay exception found at Fed.R.Evid. 804(b)(5).[1]

■ This Court spent considerable time with counsel discussing whether Crystal Higdon was, in fact, unavailable, within the meaning of Fed.R.Evid. 804(a)(5), to testify at the *federal* court hearing. See Tr. 574–619. The Court now holds that Defendant's counsel has indeed "been unable to procure [Ms. Higdon's] attendance ... by process or other reasonable means."

In an analogous factual context, the Supreme Court has stated that unavailability is measured by the "reasonable, good faith" efforts of counsel to obtain a witness to testify. *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980) (interpreting confrontation clause of the Sixth Amendment). Defendant's counsel in this case made "reasonable, good faith" efforts to procure the presence and testimony of Crystal Higdon for the federal court hearing. Counsel for Defendant attempted to serve a subpoena on Ms. Higdon for this Court's hearing, and apparently succeeded, but she did not appear. Counsel later encountered Ms. Higdon by accident, and repeated his efforts to obtain her presence. She did not respond to those entreaties, and counsel has been unable to obtain her telephone number or to call her. Tr. 579–80. Based on her actions, and his conversations with her and her mother, counsel concluded that Ms. Higdon had refused to come to this Court due to her fear of harassment by the police and adverse publicity in this case. This Court suggested that both counsel take a deposition of Ms. Higdon, which would seemingly obviate her concern. Tr. 595. Over a period of several weeks, counsel attempted to follow this suggestion, arranged a deposition, and served Ms. Higdon personally with a subpoena. Tr. 600. Despite these efforts, she refused to be deposed, and later wrote a letter to Defendant's counsel, indicating that she would refuse to testify due to the publicity surrounding the case and her fear of harassment by the police. Tr. 603–04.

These facts sufficiently indicate that Defendant's counsel has exhausted "other reasonable means" in attempting to secure Crystal Higdon's live testimony for this Court. *Cf. Ohio v. Roberts*, 448 U.S. at 75–76, 100 S.Ct. at 2543–44. Accordingly, Fed.R.Crim.P. 15(e) permits this Court to review her transcribed testimony in state

---

1. It should be noted, however, that the Federal Rules of Evidence do not, strictly speaking, apply to preliminary criminal proceedings. Fed. R.Evid. 1101(d)(3).

court in disposing of Defendant's motion to dismiss the indictment.[2]

## II. DISMISSAL OF INDICTMENT

■ As the government has emphasized in this case, the Sixth Circuit has held that courts should make "sparing use of supervisory powers" in dismissing criminal indictments. *United States v. Nembhard,* 676 F.2d 193, 199 (6th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983). Indictments can only be dismissed upon a showing of "demonstrated and longstanding prosecutorial misconduct" as well as a showing of prejudice to the defendant. *Id.* at 199–200; *United States v. Lamoureux,* 711 F.2d 745, 747 (6th Cir.1983) (per curiam); *United States v. Smith,* 687 F.2d 147, 153 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983). *See also, United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981); *United States v. Rubio,* 709 F.2d 146, 152 (2d Cir.1983). The Court will consider each of these factors in turn.

### A. PROSECUTORIAL MISCONDUCT

■ Defendant has accused various *state* police officers of wrongdoing, but has not accused the United States Attorney, or any federal agent involved with this case, of misconduct. Of course, cooperation between state and federal law enforcement officials is both common and entirely lawful. *United States v. Searp,* 586 F.2d 1117, 1119 (6th Cir.1978), *cert. denied,* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979). However, federal officials cannot predicate or justify their actions upon unlawful conduct by their state counterparts. *See, e.g., United States v. Hensley,* 713 F.2d 220 (6th Cir.1983). Thus, any improper conduct by the state officers in this case must impact on the United States Attor-

ney's authority to retry Defendant for the charges listed in the indictment.

The facts supporting the allegations of police misconduct appear to be almost entirely undisputed. They were brought out in the evidentiary hearing before this Court, wherein various police officers and the private individuals they contacted testified. The Court also relies on the state court testimony of Crystal Higdon. The relevant facts can be summarized as follows.

Sgt. Larry Smith of the Dayton Police Department, and other members of the Anti-Fencing Unit, were intensely interested in the testimony delivered at Defendant's first federal trial in September of 1982. They were particularly interested in the testimony of Crystal Higdon and William Looney which, they felt, contradicted the court testimony of Officer Hopper. This interest increased after Hopper passed a lie detector test administered by the police, which essentially contradicted the testimony of Looney and Higdon. Tr. 109. Sgt. Smith placed at least two police officers in the federal courtroom to monitor the testimony during trial. Tr. 82–88. While the trial was ongoing, Sgt. Smith and other police officers contacted Looney and Higdon, after their testimony, as well as other non-testifying individuals, for the purported purpose of conducting a perjury investigation and to convince these witnesses to "tell the truth." Tr. 300, 527.

Sgt. Smith began calling Looney shortly after he completed his testimony. He initially called to obtain Looney's social security number and birthdate, purportedly to determine Looney's correct address. Tr. 107–12. Later conversations concerned the alleged risks Looney would take in testifying in the same manner. Among other things, Sgt. Smith told Looney that "you're

2. The government also argues that even if Ms. Higdon is considered to be unavailable, her transcribed testimony should not be admitted under the hearsay exception found in Fed.R. Evid. 804(b)(5). It bases its argument on the state prosecutor's alleged failure to adequately cross-examine Ms. Higdon at the state hearing. However, the Federal Rules of Evidence do not strictly apply to this proceeding. *See* footnote one, *supra.* The Court has examined that testimony, and found that the state prosecutor's cross-examination of Ms. Higdon (state transcript at 299–320) is certainly adequate enough to withstand any attack on state counsel's competence. To the extent it was not fully developed as it might have been, it can go to the weight to be given her testimony, as this Court stated at oral argument.

gonna take some lumps if you don't change your position," that the "federal judge [was] mad" at him, and that he, Smith, would "arrange" for Looney to speak with this writer and the United States Attorney to resolve any perjury investigation. Tr. 153, 156, 159. The police also contacted and questioned Looney's ex-wife and ex-mother-in-law and also a neighbor of his, concerning his testimony. Tr. 131–33, 516.

Police contact and questioning of Ms. Higdon is also extensively developed in the record. After her testimony in this Court, two police officers, at Sgt. Smith's direction, arrested her at her home on an outstanding traffic warrant. Tr. 219, 483. Smith stated that if the Crystal Higdon listed as the subject of an outstanding warrant had *not* been the Crystal Higdon who testified at trial, she would not have been arrested.[3] Ms. Higdon was taken to police headquarters, but rather than booking or questioning her on the traffic violation, she was interrogated at length on her federal court testimony of the previous day. Tr. 405–06. She also began taking a lie detector test, after police officers persuaded her that she did not need to speak to a lawyer. Nor did they permit her attorney (Defendant's counsel in this case) to speak with her during this period. Counsel was waiting in the hall outside the testing room at the time. Tr. 450. The lie detector test was never completed, since Ms. Higdon was released at the request of this Court. The police officers involved admit that Ms. Higdon was reluctant to take the test, that they consciously did not let her speak to counsel, and that she was, in fact, brought in for the purpose of questioning her on her federal court testimony. Tr. 446, 498–99, 527.

Finally, one C.J. Perry, a possible witness for Defendant, testified at this Court's hearing. He alleged that Sgt. Smith called him in Florida, before the trial, and told him that he could be arrested on an outstanding traffic warrant if he came to Ohio

for the trial. Tr. 16. Perry, in fact, did not appear for the trial. Sgt. Smith denied having a conversation with Perry. Tr. 284–85. However, Perry stated he called back Smith in Dayton on a certain number (which the caller had left), and Smith acknowledged that the number was the same as a private number used by his office. Tr. 15, 245. Perry would have testified at trial as a credibility witness, contradicting certain testimony by Officer Hopper. Tr. 22–29.

The state appellate court characterized this conduct as "intimidation" and "harassment" of two witnesses [Looney and Higdon], designed to "change their testimony, to recant and to support the state's case in the coming [state] trial." *State of Ohio v. Smith*, slip op. at 6. For similar sentiments, see Judge Meagher's decision, slip op. at 4. This Court cannot reach a different conclusion. Similar actions have been characterized as prosecutorial and/or police misconduct, sufficient (together with a showing of prejudice to the Defendant) to justify a retrial *or* dismissal of an indictment. *See, e.g., United States v. Hammond,* 598 F.2d 1008, 1013 (5th Cir.1979) (FBI agent threatened two defense witnesses with "trouble" in pending state prosecution); *United States v. Morrison,* 535 F.2d 223, 225 (3d Cir.1976) (defense witness intimidated by repeated warnings from Assistant United States Attorney that she would be subject to federal perjury charge if she testified falsely); *United States v. Thomas,* 488 F.2d 334, 335 (6th Cir.1973) (per curiam) (Secret Service Agent told prospective defense witness that he would be prosecuted for perjury if he testified). *See also,* Annot., 57 A.L.R. Fed. 824 (1982) (compiling cases).

The Court does not take lightly its conclusion that the police officers in this case were guilty of misconduct. But that conclusion is, regrettably, inescapable, given the uncontradicted evidence proffered at

---

**3.** It must be admitted that there is some ambiguity in Sgt. Smith's testimony on this point. *Cf.* Tr. 220 & 298 (relating statement summarized in text) *with* Tr. 272–73 (only intended to serve

the Crystal Higdon on the capias list). Needless to say, the later actions of the police belies total reliance on the latter statement.

the hearings before Judge Meagher and this Court. The officers involved were intelligent and conscientious men. Although the actions they took were *after* the federal court testimony of Higdon and Looney, they knew, or should have known, that a state court trial involving these witnesses was looming, *and* that a federal court *retrial* was possible, given that the first trial had ended in a hung jury. *Cf.* Tr. 330–33. (testimony of Sgt. Smith). It strains credulity to the breaking point to believe that their actions were "only" to ascertain the "truth."

At various points in their testimony, the police officers insisted that they were merely following accepted police investigative procedures. What such procedures were, or should have been, was not the focus of the hearing before this Court. However, as this Court suggested, Tr. 261, 263–64, the verbalized good faith of the police officers has little relevance to objectively characterizing their conduct. *Accord, United States v. Morrison*, 535 F.2d at 227.

Whatever modern police procedures would indicate to be proper investigative methods in a perjury investigation, such procedures *must not and cannot* impact upon a criminal defendant's right to a fair trial, which must be secured by the ability to call witnesses in defense who have not been intimidated or harassed beforehand. That the state trial had not yet taken place was obvious, that this federal court case might have to be retried was conceded, and that the actions of the police would have the result of impacting upon a witness'

willingness to take the stand on behalf of the defendant should have been clear to the rawest rookie in the police department.

■ Based on the foregoing summary of facts and relevant legal authority, the Court concludes that the state police officers in this case engaged in a pattern of misconduct which, intentionally or not, resulted in intimidation and harassment of witnesses for the Defendant Smith, upon his planned retrial in this Court.[4] The Court now turns to the question of what specific prejudice, if any, inured to Defendant as a result of this misconduct.

## B. PREJUDICE TO THE DEFENDANT

■ Prejudice of sufficient magnitude to justify dismissing an indictment must have or threaten "some adverse effect upon the effectiveness of counsel's representation or [produce] some other prejudice to the defense." *United States v. Morrison*, 449 U.S. at 365, 101 S.Ct. at 668. Here, Defendant asserts that his defense at the federal retrial has been severely compromised by the intimidation and harassment of witnesses favorable to his position. Those witnesses, he argues, may be unwilling or unable to testify in a convincing manner at trial, or be unwilling to testify at all.

It is well settled that a criminal defendant's right to present witnesses in his own defense is a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment to the Constitution.[5] *Chambers v. Mississip-*

---

**4.** As indicated in the text, case law in this and other circuits has stated that the prosecutorial or police misconduct must be "demonstrated and longstanding." It is not entirely clear if the "longstanding" requirement means to cover a series of cases, *cf. United States v. Nembhard,* 676 F.2d at 200 n. 4, or merely several acts with regard to one defendant in one case, *cf. United States v. Thomas.* In any event, the Court finds that the officers' *pattern* of conduct in this case (covering both a federal and state prosecution) is sufficient to satisfy the "longstanding" requirement.

**5.** It is not entirely clear if this right is grounded in the Due Process Clause of the Fifth and

Fourteenth Amendments, the Sixth Amendment, or both. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982); *United States v. Hammond,* 598 F.2d at 1012 n. 3; *United States v. Morrison,* 535 F.2d at 226 n. 6. Nor is it clear whether or not, to establish the existence of the right in a particular case, prejudice must be shown. *United States v. Blackwell,* 694 F.2d 1325, 1341 (D.C.Cir. 1982); *United States v. Thomas,* 488 F.2d at 335. However, it is agreed, as noted in the text, *supra,* that prejudice *must* be shown to justify the remedy of dismissing an indictment.

*pi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972) (per curiam); *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *United States v. Thomas*, 488 F.2d at 336. The crucial question in this case is whether this right of Defendant has been sufficiently invaded so as to justify the remedy of dismissal.

As outlined above, Defendant asserts that three defense witnesses for the federal court retrial—Perry, Looney, and Higdon—will not testify adequately, or testify at all, for him.

With regard to Perry, who testified at this Court's hearing, it is apparent that he was genuinely intimidated by a phone call (from Sgt. Smith, he said) and, for that reason, did not attend the first trial. Tr. 16, 19–21. He did not testify at the trial, but he did testify at the hearing before this Court, he stated, when friends convinced him to help Defendant. Tr. 29–30. Defendant intended to use Perry as a credibility witness, directly contradicting certain testimony by Hopper. Tr. 22–29. However, there is no indication in the record that Perry would refuse to testify at the second trial. As Defendant's counsel candidly admitted at oral argument, he simply did not question Perry on that point. The issue becomes whether Perry's non-appearance at the first trial, due to intimidation, can be used to infer a prospective failure to attend the second trial to testify. The Court concludes that such an inference can logically be drawn, but that it is a relatively weak one. Such an inference, standing alone, would not justify the dismissal of this indictment.

With reference to Looney, he stated that, although he was scared and intimidated by Sgt. Smith's phone calls, he would be willing to testify again at a federal court retrial, Tr. 354–355, 385–86, and to testify truthfully. Tr. 382. Defendant argues that Looney's fright will affect his in-court testimony and demeanor and, therefore, make him a less persuasive witness to the jury. This inference is a highly speculative, but not a completely illogical, one. As the Sixth Circuit stated in *United States v. Thomas*, "[t]here is an obvious and considerable difference between the free and open testimony anticipated of a voluntary witness and the perhaps guarded testimony of a reluctant witness who is willing to appear only at the command of the court." 488 F.2d at 336. In this case, of course, the intimidation of police officers replaces that of a court order found in the *Thomas* case. Any inference that the intimidation of Looney would affect his in-court testimony and demeanor and, therefore, make him a less persuasive witness to the jury, standing alone, or together with the above referenced inference with respect to the affect of the intimidation upon Perry, would not justify the dismissal of this indictment.

Finally, the Court addresses the asserted unavailability of Ms. Higdon to testify at the federal retrial. In her state court testimony, she stated that she would refuse to testify at any new trial regarding Defendant, and that she would refuse to testify if brought into court. The validity of her statements is underscored by her refusal to appear for even this Court's hearing (much less a trial), or for a deposition. Thus, Defendant seems to have established a clear case of prejudice with regard to Ms. Higdon's testimony.[6]

The government argues that any prejudice to Defendant can be lessened or elimi-

---

**6.** The prejudice can be seen by examining Ms. Higdon's testimony at the first federal trial. Therein, Ms. Higdon testified that she often saw Hopper in the back offices of Defendant's chicken restaurant. First Trial Tr. 330 *et seq.* These statements directly contradict Hopper's testimony that he never had such meetings with Defendant, *id.*, Tr. 130–31, and thus impeaches his credibility. Her testimony is crucial for three reasons: (1) it shows Hopper and Defendant meeting in 1978 and 1979, over a year before Hopper claims he ever met Plaintiff, (2) it shows Hopper in the chicken restaurant with Defendant, which Hopper denies, and (3) their alleged meetings support an inference of nefarious conduct on the part of Hopper (i.e., dealing in food stamps), which supports Defendant's version of his dealings with Hopper, and contradicts that of Hopper.

nated by the reading of the transcript of her testimony at the *first* federal trial in place of her live testimony at the *second* federal trial. Defendant contends that her *live* testimony would be far more effective than reading a transcript of the first trial testimony.

The weight to be given Defendant's contention depends on the importance to be given *live* testimony vis-a-vis that given transcript or deposition testimony. Whether interpreting the Compulsory Process and Confrontation Clauses of the Sixth Amendment, or the presumption against using hearsay evidence, courts and commentators have emphasized the importance of and preference for face-to-face, personal in-court testimony. *See, e.g., Ohio v. Roberts*, 448 U.S. at 63, 65, 100 S.Ct. at 2537, 2538; *United States v. Mann*, 590 F.2d 361, 367 n. 8 (1st Cir.1978); E. Cleary, McCormick on Evidence 581–84, 617 (1972 ed.); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 800[01] at 800–10 (1981 ed.); Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 Harv.L.Rev. 567, 589–93 (1978). Such testimony helps to insure the reliability and effectiveness of the witness, by subjecting him or her to examination and cross-examination, and by permitting the jury to view the demeanor of the witness. *Ohio v. Roberts*, 448 U.S. 63 & n. 6, 100 S.Ct. 2537 & n. 6; E. Cleary, *supra*, at 581; Westen, *supra*, at 589 & n. 59.[7]

Based on these accepted principles, and upon the particular facts of this case, as developed in the federal court trial, the Court must agree with Defendant that Ms. Higdon's transcribed testimony is no substitute for her live testimony. Of course, the Court is *not* holding that live testimony, as a matter of law, will *always* be preferable to the reading of transcribed testimony. Such a holding is obviously too

broad a statement for either civil or criminal proceedings. However, the facts of *this case* justify the preference for live testimony, since the police officers' conduct deprived Defendant of the option of using that testimony and, additionally, since the witness' testimony is needed to directly contradict that of Police Officer Hopper. To unhesitatingly permit use of transcribed testimony would, in effect, countenance the police officers' conduct and continue the prejudicial effect of their conduct. *See United States v. Armijo-Martinez*, 669 F.2d 1131, 1139 (6th Cir.), *vacated and remanded on other grounds*, ─ U.S. ──, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982).

Accordingly, the Court finds that the conduct of the police officers *has* resulted in prejudice to the presentation of a defense by Maurice Smith. The inference of prejudice exists, but is weak, for the testimony of Perry and Looney (the former because it is not clear if he would be present for a second trial; the latter because his demeanor could be affected at the second trial). In contrast, the inference of prejudice is strong with respect to Ms. Higdon. Her refusal to testify at all is based on the conduct of the police officers, and deprives Defendant of his right to present the *live* testimony of witnesses in his favor to contradict the testimony of police officers, as a means of attempting to affect their credibility and of setting forth the crux of the Defendant's defense (i.e., entrapment). The use of transcribed testimony for this purpose, considering that the testimony of the police officers will be presented live, simply is not a sufficiently effective alternative to protect the Defendant's right to a fair trial. In short, the affect of the intimidation upon Perry and Looney, together with affect of same upon Higdon, mandates this Court to dismiss the indictment.

---

7. The common sense notion that the live, in-court testimony of a witness makes a greater impact on jurors than the reading of recorded testimony is supported by most empirical studies. *See* Loh, *Psycholegal Research: Past and Present* (Review Essay), 79 Mich.L.Rev. 659, 700 & n. 195 (1981). *But cf.* Note, *The Theoretical Foundation of the Hearsay Rule*, 93 Harv.L.Rev. 1786, 1798 n. 50 (1980) ("asserted value of demeanor as an indicium of reliability … seems suspect," citing several studies).

Lest it be argued that the police actions toward Crystal Higdon occurred at a point of time when the police officers had reason to believe that her testimony in federal court was concluded (after her testimony at the first trial and before the jury became "hung" and a mistrial was declared), and that, therefore, the police had no intention to deprive the Defendant of his right to a fair trial in *federal* (as opposed to state) court, this Court would point out that the police officers' intentions were immaterial. Only the results, whether intentional or not, are at issue in this matter. Even assuming, arguendo, the *result* was *un* intentional on the part of the police officers, the end result *was* intimidation and harassment of the Defendants' witnesses. Moreover, it should be pointed out, once again, that the police actions directed toward Perry occurred *prior* to the federal trial, and those directed toward Looney, while occurring after the federal trial, occurred at a point in time when the officers knew that a hung jury had occurred, a mistrial had been declared, and that a retrial was a distinct possibility.

## III. CONCLUSION

Defendant having demonstrated in this case both that there was police misconduct, and that such misconduct prejudiced his ability to present a defense, this Court finds that "sparing use" of dismissal of an indictment is appropriate in this case. The government has argued, as already noted above, that less drastic remedies are available to this Court, short of dismissing the indictment. These might include reading Ms. Higdon's or Looney's transcribed testimony, requesting the United States Department of Justice to investigate the behavior of the Dayton police officers in question, or publicly chastising the officers for their conduct. *See also, United States v. Hastings,* —— U.S. ——, 103 S.Ct. 1974, 1979 n. 5, 76 L.Ed.2d 96 (1983).

The remedy for the improper conduct and prejudice to Defendant identified by this Court "should be tailored to the injury suffered." *United States v. Armijo-Martinez,* 669 F.2d at 1139 (quoting *United*

*States v. Morrison,* 449 U.S. at 364, 101 S.Ct. at 667). Here, only dismissal of the indictment will match the prejudice suffered by Defendant. The misconduct of the police officers will directly impact upon the presentation of a defense, through the intimidation of defense witnesses. *See, id.* ("drastic remedy" of dismissal justified when government unilaterally removed, as aliens, 14 defense witnesses from the country). The adverse impact of the police conduct simply "cannot be removed by any remedy short of dismissal." *Id.* See also, the appellate court decision in *State of Ohio v. Smith,* slip op. at 8–11 (reaching same conclusion on the facts of this case).

The investigative work of state and federal officers is an important, difficult, and largely unappreciated one, and should not be unduly stifled by the Courts. Only in an environment supervised by police officers and other government officials can the liberties of all of our citizens be exercised and protected. Nevertheless, the investigative methods found in this case ran afoul of the liberties of Maurice Smith, and justify dismissal of the federal charges found in the indictment against him.

A word must be said at this point about Sgt. Larry Smith and the responsibility of the Dayton Police Department, both in this and in similar cases. This Court does not believe Sgt. Smith to be a dishonest man. He portrayed to the Court the picture of an honest police officer, understandably angry at the fact that the honesty and integrity of a fellow police officer, one under his supervisory authority, had been called into question. That Officer Smith's intentions (and the intentions of those who worked with him in this matter) might not have been to obstruct justice or to deprive the defendant of a fair trial (or retrial), is beside the point. That Officer Smith and the others wanted only a good result (allegedly, the clearing of Detective Hopper of suspicion of perjury and criminal activity, through the vehicle of persuading Looney and Higdon to recant their testimony and to "tell the truth"), does not justify the means exercised. Sgt. Smith's professed good inten-

tions make the means he utilized to accomplish these ends no less nefarious and, quite frankly, all the more frightening. An experienced police officer, such as Sgt. Smith (and the others associated with him in this endeavor), should have realized the consequences of his actions. If these consequences were understood, beforehand or contemporaneously with these actions, then the citizens of the City of Dayton have reason to be concerned with the methods utilized by police when discharging their investigative responsibilities. If, on the other hand, Sgt. Smith and the others did *not* realize the consequences of their actions, then the citizens of the City of Dayton have every reason to be frightened, even terrified, at the spector of police authority exercised with no thought or concern for the rights of the citizenry to a fair trial.

The responsibility of the Dayton Department of Police is clear. This responsibility cannot be discharged by disciplining Sgt. Smith, a career police officer of many years standing who, to this Court's understanding, has never had a blot or a cloud upon his record. Rather, this responsibility can only be discharged through a program of educating all police officers, the veteran down to the newest recruit, as to the practical application of the meaning of a defendant's right to a fair trial. The citizens of this community have a right to expect that their rights to a fair trial will be zealously guarded by those in authority and that said right will not be compromised by over eager police officials who, under the guise of the exercise of their investigative authority, make it extremely difficult for a criminal defendant to be able to procure the services of willing and, presumably, knowledgeable witnesses to testify in their behalf.

As stated, the responsibility of the Dayton Department of Police is clear. One can only hope that it will accept that responsibility and rise to the challenge it entails.

The indictment herein is dismissed.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.