**Scott Bruce DAVIS, Petitioner,**

v.

**John JABE, Warden, Michigan Reformatory, Ionia, Michigan, Respondent.**

**Civ. A. No. 84–CV–3935–DT.**

United States District Court, E.D. Michigan, S.D.

March 20, 1986.

P.E. Bennett, State Appellate Defender Office, Lansing, Mich., for petitioner.

Thomas A. Kulick, Attorney General's Office, Corrections Div., Lansing, Mich., for respondent.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

On the evening of May 22, 1980, between 11:30 p.m. and midnight, John Ryan, Jr. returned to his father's home in Pontiac, Michigan and found that his father, John Ryan, Sr. had been shot in the back of the head with his own .22 caliber rifle. The victim's wallet was missing and was never recovered. An autopsy indicated that Ryan, Sr. had been shot at a distance of from six to twenty feet and placed the time of death between 10:00 and 10:30 p.m.

Petitioner was a friend of Ryan, Jr. and had at one time lived at the Ryan home. At the time of the murder, however, he was staying at the home of his cousin, Ronald McClusky. The day following the murder, Petitioner told Detective Robert Bates that he had been at the Ryan home between 10:00 and 10:15 p.m. He stated that he had talked to the victim, telephoned his sister, and after approximately fifteen minutes, left to go to his sister's house. In a statement made to the police the following day, Petitioner admitted having searched through the house for some items he had left there. He also admitted that he may have touched the murder weapon.

Petitioner was arrested for the murder about a week later. Because he was only sixteen years old at the time, he was placed in the Oakland County Children's Village. On February 27, 1981, he was convicted by a jury of first degree murder and was subsequently sentenced to life imprisonment.

At trial, the following evidence was presented: Terry Lee McClusky, another of Petitioner's cousins, testified that he dropped Petitioner off at the victim's house at about 8:00 p.m. on May 22. A neighbor, Nancy McKee, testified that she drove by the victim's house between 9:40 and 9:45 p.m. that evening, that she saw Ryan, Sr. talking to a male with long, straight hair, and that Ryan, Sr. waved at her when she sounded the horn. Petitioner had long, straight hair on May 22.

Twelve-year-old Lonnie Cunningham, who lived next door to the victim, testified that a little after 10:00 p.m. he saw Petitioner enter the Ryan home through the back door, go into the bedroom, pick something up, and move on. Ryan, Jr. had previously testified that one of the rifles was kept in the bedroom which Cunningham claimed to have seen Petitioner enter. The record indicates, however, that someone may have suggested to Cunningham that Petitioner was the person he saw.

Ronald Arnold, who lived on the street next to the Ryans, testified that he saw Petitioner walking down the street between 10:20 and 11:00 p.m. Although he was unsure of whether Petitioner heard him, Arnold stated that when he called and whistled at him, Petitioner began to run away. The prior testimony of Sharon Ann Eaglan, a friend of Petitioner's family, was read to the jury. She stated that Petitioner had come to her house at about 10:45 p.m. on the night of the murder, called his sister, left after about five minutes, and did not seem excited or in any way abnormal. She further testified that Petitioner telephoned her the following day, told her that he was "involved in some murder or something," and asked her if he had been at her home at 9:45 p.m. the previous night. He asked her to tell the police that he had been at her home, but did not suggest that she lie about the time.

An employee at the Oakland County Children's Village stated that on June 29, 1980, Petitioner and some of the other boys were boasting about the reasons for their confinement. The employee testified that when one of the boys said that he had heard that Petitioner was in for murder, Petitioner replied, "Yeah, I blew the sucker's brains out, and he only had thirty dollars in his pocket."

Ronald McClusky testified that three or four days before the murder, Petitioner had asked to borrow McClusky's brass knuckles in order to hit and rob Ryan, Sr. According to McClusky, Petitioner asked to borrow his shotgun a few days later, stating that he intended to blow Ryan Sr.'s head off and that on May 21, the day before the murder, Petitioner again asked to borrow a rifle. McClusky testified that he turned down each of these requests and in a statement to police, said that he was not sure whether Petitioner had been kidding at the time. McClusky's wife corroborated his testimony but also testified that neither she nor her husband believed that Petitioner had committed the murder.

Petitioner, in his defense, argued that others might have committed the murder and that, therefore, the prosecution had not proven its case beyond a reasonable doubt. For example, he presented evidence that

Ryan, Sr. had previously evicted two of his sons from his house by court order and that the victim and Ryan, Jr. had argued over money soon before the murder. He presented evidence that the victim's brother had told police immediately after the murder that the victim's sons were probably responsible. In addition, he established that many people in the neighborhood believed that the victim was wealthy and that he had cash on hand at the time of the murder.

The main target of Petitioner's defense, however, was Ronald McClusky. McClusky, who lived a block and a half from the victim, testified that although he had been friends with Ryan, Jr., he had never warned him of Petitioner's alleged plans to kill his father. In addition, he testified that he had never gotten along with Ryan Sr. and that he believed that there was money in the house. McClusky further testified that he was unemployed, was living on public assistance and by selling marijuana, and that his car had recently been repossessed. He admitted discussing burglary as a way of making money with Petitioner and having at one time lent Petitioner his brass knuckles, claiming that it was because they lived in a dangerous neighborhood. McClusky denied ever having burglarized the Ryan home or even discussing it.

As part of this defense, Petitioner wished to present the testimony of his brother, Larry Davis. According to an affidavit filed with this court on August 30, 1985, Larry Davis would have testified as follows:

> I along with my brother Scott Davis and Ron McClusky were playing cards at Ron's home in the dining room on a Friday or Saturday evening during the latter part of April, 1980;
> While the three of us were playing cards, Ron's wife, Patricia and their infant son were occupied in another room in the house;
> During the course of the evening, I recall Ron saying: "Hey, man, I know how you guys can make some money. You can

take these here (pointing to the homemade brass knuckles) and go to Big John's [Ryan, Sr.] and hit him because he should have about three grand in his pocket."
> I said: "No way. I'm not getting into that type of shit."
> Scott said: "No way, Bullshit."

The trial court ruled this testimony inadmissible. The Michigan Court of Appeals subsequently found the exclusion of the testimony improper as a matter of state law. It found, however, that the error was harmless:

> Inconsistent out-of-court statements of a witness are admissible only for impeachment purposes and, since they would otherwise be hearsay, cannot be used as substantive evidence of the truth of the matter asserted....
> In light of McClusky's testimony on both direct and cross-examination concerning the sources of his income, and his discussions with defendant regarding breaking and entering houses in order to get money, the jury was clearly apprised of McClusky's questionable veracity.

The appellate court then rejected Petitioner's constitutional claims stating:

> In the instant case the hearsay statement was not made under circumstances that provided considerable assurance of its reliability, as were the statements in *Chambers*. Most importantly, its admission as substantive evidence was not "critical" to defendant Davis' defense. To the extent McClusky's statement reflected his desire that defendant and his brother assault and rob the victim, it established his complicity in the crime. It did not, however, in any way exculpate defendant, or tend to show that McClusky, rather than defendant, had committed the crime.

Petitioner subsequently filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing that the trial court violated his Sixth Amendment rights to compulsory process for obtaining a witness in his defense and to confront a witness who has testified against him, and his

Fourteenth Amendment right to due process of law.

In *Chambers v. Mississippi*, 410 U.S. 284, 294, 302, 93 S.Ct. 1038, 1045, 1049, 35 L.Ed.2d 297 (1973), the Supreme Court stated:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the state's accusations. The right to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.... Few rights are more fundamental than that of an accused to present witnesses in his own defense.

The Court had earlier ruled in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process.

The facts of this case do not raise an issue under the Confrontation Clause. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), quoting 5 J. Wigmore, Evidence § 1395, 123 (3d ed 1940). The record in this case reveals that the trial court did not prevent defense counsel from adequately cross-examining McClusky. Therefore, Petitioner's Confrontation Clause claim is meritless. *Davis v. Alaska*, 415 U.S. 308 (1974); *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984); *United States v. Smith*, 748 F.2d 1091 (1984).

Petitioner's claims of violation of his rights to due process and compulsory process, however, are substantial. In *Washington v. Texas*, the Court found that the petitioner's right to compulsory process had been violated when he was "arbitrarily denied ... the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony was relevant and material to the defense." 388 U.S. at 23. Most recently, the Supreme Court held that in order to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment, the accused must make "some showing that the evidence lost would be both material and favorable to the defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 23 L.Ed.2d 1193 (1982).

In the case now before the court, Petitioner's defense was that someone else had committed the murder. He proffered his brother's testimony, not simply to impeach McClusky's credibility in general, but to expose his bias and motivation to testify on the central issue of the defense.

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant; unconsciously or otherwise, his testimony in favor or against a party. Bias may be introduced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness.

*United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984).

The proffered testimony in this case, if believed, might have established that McClusky's motivation to testify was to shift the suspicion of guilt from himself to Petitioner. Testimony that McClusky had contemplated a violent robbery of the victim, less than a month before the robbery

and murder, may have been sufficient to create a reasonable doubt of Petitioner's guilt in the mind of the jury. It was relevant to show that McClusky, rather than Petitioner, may have committed the crime. Such evidence was clearly material and favorable to Petitioner's defense.

The state court's reasoning that the proferred statement in no way exculpated Petitioner and therefore, was not "critical" to his defense, is erroneous. Testimony need not directly exculpate the accused in order to be admissible; it need only be material and favorable to the defense.

In examining its past decisions "in what might loosely be called the area of constitutionally guaranteed access to evidence," the Supreme Court's "materiality requirement is more than borne out." *Valenzuela-Bernal,* 458 U.S. at 867–68, 102 S.Ct. at 3446. For example, the Court noted that in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), it held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." In *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972), the Court held that a *Brady* claim would succeed "where the evidence is favorable to the accused and is material either to guilt or punishment." And in *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), the Court noted that a "fair analysis of the holding of *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome at trial."

While not directly exculpating him the possibility that the proferred testimony, when combined with the evidence already admitted, may have led the jury to reasonably doubt Petitioner's guilt, renders it material and favorable. As such, Petitioner was constitutionally entitled to present it.

This reasoning was applied in a factually similar case from this circuit. In *Hill v. Rose,* 579 F.Supp. 1030 (M.D.Tenn.1983), the petitioner, who had been convicted of murdering a woman with whom he was romantically involved, sought to demonstrate at trial that a rival for his affections, a woman named Potts, actually committed the murder. In furtherance of this defense, the petitioner proferred the testimony of Mr. Williams, who would have testified that Ms. Potts told him about a conversation between herself and the victim in which they threatened each other's lives. Williams would also have testified that during their conversation, Ms. Potts told him directly of her intention to shoot the victim if she did not stay away from the petitioner.

Williams' testimony was not admitted by the trial court. On cross-examination, Ms. Potts denied making any such statements to Williams. On these facts, the district court found a violation of due process under *Chambers* and *Washington v. Texas* because the accused was deprived of his right to a fair opportunity to defend himself. The district court further found that the state had violated the right guaranteed petitioner by the Sixth Amendment to compulsory process for obtaining witnesses in his favor.

The state court's secondary rationale supporting its view that the trial was conducted in compliance with the Constitution was that the declarant's hearsay statement lacked any independent indicia of reliability. The state's reliance on *Chambers* for this proposition is misplaced. In *Chambers,* 410 U.S. at 298, 93 S.Ct. at 1047, the Court recognized that:

[t]he hearsay rule ... is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his

demeanor and credibility may be assessed by the jury. (citation omitted.)

The Court further noted that:

[a] number of exceptions have developed ... to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of oath and opportunity for cross-examination.

*Id.* at 298–99, 93 S.Ct. at 1047.

Although McClusky's statement in this case was not made under circumstances providing the overwhelming assurances of reliability as were the statements in *Chambers*, McClusky, like the declarant in *Chambers* was available in court for further questioning. The Court in *Chambers* found this fact of particular significance, stating:

Finally, if there was any question about the truthfulness of the extrajudicial statements, [the declarant] was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.

\* \* \* \* \* \*

In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

*Id.* at 301–02, 93 S.Ct. at 1049.

Quoting *Rosen v. United States,* 245 U.S. 467, 471, 38 S.Ct. 148, 150, 62 L.Ed. 406 (1918), the Court in *Washington v. Texas* stated:

the conviction of our time that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court....

*Washington v. Texas,* 388 U.S. at 22, 87 S.Ct. at 1924–25.

It is uncertain whether the jury as sole judge of the credibility of a witness would have believed Larry Davis' testimony had it been admitted. The jurors were entitled, however, to have the benefit of the defense theory before them in order to make an informed judgment as to the weight to place on McClusky's testimony which provided an important link in the proof of Petitioner's act. Exclusion of the profferred testimony therefore resulted in a denial of Petitioner's rights as guaranteed by the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment. Where the right to compulsory process is violated, no lack of prejudice will cure it. *Dickerson v. Alabama,* 667 F.2d 1364 (11th Cir.), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982); *United States v. Hammond,* 598 F.2d 1008, 1013 (5th Cir.1979); *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976); *United States v. Thomas,* 488 F.2d 334 (6th Cir.1973); *Bray v. Peyton,* 429 F.2d 500 (4th Cir.1970).

For the foregoing reasons,

IT IS ORDERED that a conditional writ of habeas corpus is hereby granted. Unless a date for a new trial is scheduled within ninety days, Petitioner must be unconditionally released at that time.

IT IS SO ORDERED.