932 F.2d 967
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Nathan CODY, Petitioner-Appellant
v.
John JABE, Warden, State Prison of Southern Michigan,
Respondent-Appellee.
 No. 90-1267.
 United States Court of Appeals, Sixth Circuit.
 May 6, 1991.
 
 Before DAVID A. NELSON and SUHRHEINRICH, Circuit Judges, and HACKETT, District Judge.*
 PER CURIAM.
 
 
 1
 Petitioner Nathan Cody ("Cody") appeals the district court's judgment dismissing his petition for a writ of habeas corpus filed under 28 U.S.C. Sec. 2254, claiming his constitutional right to due process of law under the fourteenth amendment was violated as a result of the withdrawal of a pretrial plea bargain agreement and alleged prosecutorial misconduct. For the reasons that follow, we affirm.
 
 I. FACTS
 
 2
 In October 1975, Vandy Fletcher was murdered by several gunshots fired by two gunmen in an ambush outside his home. Cody was charged with first degree murder. Before trial, however, the prosecutor entered into a plea bargain agreement in which Cody was permitted to plead guilty to a charge of manslaughter and receive a 5- to 15-year sentence in exchange for naming and testifying against both the "triggerman" and the person who contracted the killing. On June 25, 1976, Cody gave a sworn statement to police naming Alton Mallory as the "trigger man" and Lee Gray as the man who contracted the killing.
 
 
 3
 Cody testified at the preliminary examination of Alton Mallory, who was subsequently bound over on a charge of first degree murder. However, on August 24, 1976, the prosecutor dismissed charges against Mallory by order nolle prosequi, due to an inability to corroborate Cody's statements by extrinsic evidence. The prosecutor then withdrew the plea bargain agreement, claiming that Cody had not testified truthfully. The prosecutor based this claim on alleged discrepancies and inconsistencies between Cody's sworn statement to the police, subsequent statements made to the prosecutor in order to clarify his sworn statement, and his preliminary examination testimony. The subsequent statements were made following a conversation in which the prosecutor indicated to Cody that the plea agreement would still be available if petitioner "came clean" and told the "whole truth."
 
 
 4
 Cody was tried on a charge of first degree murder. Witnesses Annie Love, Zelma Fletcher, and Minnie Fletcher testified to hearing dying declarations by the victim identifying Cody as the man who shot him. In addition, the victim's seven-year-old son, Frank Love, testified that he saw Cody with a gun in his hand immediately after the shooting of his father. The trial judge prohibited the prosecutor from using Cody's sworn statement, subsequent statements, or preliminary examination testimony during the trial. Cody was convicted by a jury on August 23, 1976. Cody filed a motion for new trial contending, among other things, that the plea bargain should have been enforced. The trial judge conducted an evidentiary hearing on November 19, 1976, January 14, 1977, January 27, 1977, and April 7, 1977, receiving testimony from the former county prosecuting attorney, an assistant prosecutor, the defendant, four police officers, a private polygraph expert, and the attorney for a co-defendant. After reviewing Cody's testimony and concluding that at various points he had changed his story regarding important details of the crime, the trial court denied the motion for new trial and sentenced Cody to life imprisonment.
 
 
 5
 Cody appealed to the Michigan Court of Appeals, which affirmed the conviction. On May 23, 1980, the Michigan Supreme Court remanded to the Court of Appeals for amplification of the reasons underlying its determination that the trial court did not err in concluding that Cody had not substantially performed the plea agreement. On July 22, 1980, the Court of Appeals again affirmed the conviction, concluding that there were discrepancies in Cody's various statements concerning the details of Fletcher's killing, and that the truthfulness of defendant's testimony was "in grave doubt." The Michigan Supreme Court denied application for leave to appeal. People v. Cody, 414 Mich. 909 (1982) (Levin, J., dissenting). Cody later filed a motion for leave to file a delayed motion for new trial, which was denied by the trial court on June 16, 1986. The Michigan Court of Appeals denied leave to appeal on December 22, 1986, as did the Michigan Supreme Court on August 27, 1987.
 
 
 6
 On February 17, 1989, Cody filed for a writ of habeas corpus in federal district court, claiming he was denied due process when the prosecutor failed to honor the plea agreement. Cody also claimed he did not receive a fair trial due to the prosecutor's allegedly improper questioning of his girlfriend, Ginger Kennedy ("Kennedy"). In dismissing the habeas corpus petition, the district court held that Cody was not denied due process because in testifying untruthfully he failed to comply with the plea agreement. The district court also held that petitioner was not deprived of a fair trial through the prosecutor's questioning of Kennedy. On May 11, 1990, we granted a certificate of probable cause to appeal.
 
 III. DISCUSSION
 
 7
 A. Standard of Review.
 
 
 8
 1. Habeas Petitions.
 
 
 9
 In cases involving petitions for a writ of habeas corpus, we review a district court's determinations de novo. McKenzie v. Risley, 842 F.2d 1525 (9th Cir.), cert. denied, 488 U.S. 901 (1988). In reviewing Cody's habeas petition, we are mindful of our obligation under 28 U.S.C. Sec. 2254(d) to "accord a presumption of correctness to state-court findings of fact." Sumner v. Mata, 455 U.S. 591, 592 (1982). Where a case involves a mixed question of law and fact, a federal court "may give different weight to the facts as found by the state courts and may reach a different conclusion in light of the legal standard, but the questions of fact that underlie the ultimate conclusion are governed by the statutory presumption ..." Id. at 597 (emphasis in original). The presumption applies to findings of state appellate courts as well as state trial courts. Neuschafer v. McKay, 807 F.2d 839 (9th Cir.1987).
 
 
 10
 2. Plea Agreements.
 
 
 11
 Plea agreements are subject to contract-law standards of interpretation. Santobello v. New York, 404 U.S. 257, 262 (1971). If the defendant abides by the agreement, the government is bound to its promises. United States v. Garcia, 698 F.2d 31, 37 (1st Cir.1983). On the other hand, a defendant's failure to fulfill the terms of a plea agreement relieves the government of its reciprocal obligations under the agreement. United States v. Calabrese, 645 F.2d 1379, 1390 (10th Cir.1981), cert. denied, 454 U.S. 831 (1982). While bound by the state court's findings of facts, we must undertake an independent review of whether the factual discrepancies in Cody's testimony and statements constituted "a 'substantial breach' of the plea agreement ... 'in light of the parties' reasonable expectations' upon entering the agreement." United States v. Ataya, 864 F.2d 1324, 1330 (7th Cir.1988) (citations omitted).
 
 
 12
 B. The Plea Agreement.
 
 
 13
 The parties' reasonable expectations with regard to the plea agreement were that Cody would be allowed to plead guilty to manslaughter in exchange for truthfully naming the "triggerman" and the contractor and testifying at their preliminary examinations and trials. The following exchange occurred on the record prior to Cody's sworn statement on June 25, 1976:
 
 
 14
 [Defense attorney]: The testimony that will be given at this particular point has been agreed upon by virtue of plea negotiations between Mr. Sawyer and attorney Logan as to Mr. Nathan Cody, the defendant in this particular matter, entering a plea to Manslaughter--minimum of five years as a guarantee from the presiding Judge. That's my understanding--incorrectly, please advise.
 
 
 15
 [Prosecutor]: No, that's the correct understanding. Now this of course, as I explained to you, you know, is contingent on this testimony being true of course.
 
 
 16
 [Defense attorney]: Okay.
 
 
 17
 [Prosecutor]: You know, I--I don't--I don't just want to buy a pig in a poke on the situation. I mean I understand that Mr. Cody is able to name the trigger man in the situation and be in a position to testify against him at the subsequent trial. That he is also able to name the contractor on the matter, the person who let the contract, and be in a position to testify against him in the trial.
 
 
 18
 [Defense attorney]: That's my understanding.
 
 
 19
 [Prosecutor]: Right--
 
 
 20
 [Defense attorney]: That's your understanding?
 
 
 21
 [Cody]: Yes it is.
 
 
 22
 The following exchange occurred on the record during Cody's July 13, 1976 preliminary examination testimony:
 
 
 23
 [Prosecutor]: Now, Mr. Mirque asked you about the arrangement that was made between the Prosecutor's office and yourself and your attorney in your behalf--is it not correct, sir, that the arrangement was that you were to tell the truth, the whole truth, nothing but the truth and that any offer or any discussion with regard to the offer was contingent upon us being able to establish that you were in fact telling the truth?
 
 
 24
 [Cody]: Yes.
 
 
 25
 [Prosecutor]: And if we did in fact establish to our satisfaction that you were telling the truth, that you would then also testify in Court, if need be. Is that correct?
 
 
 26
 [Cody]: Yes.
 
 
 27
 The state contends that Cody breached the agreement by failing to testify truthfully, as evidenced by discrepancies between his sworn statement to police, subsequent statements made to the prosecutor, and his preliminary examination testimony.
 
 
 28
 C. Petitioner's Sworn Statement to Police.
 
 
 29
 Cody's description of the murder provided in his sworn statement to the police is as follows. In September 1975, Cody testified that he received a phone call in Detroit, where he was living, from a woman named Rose Cook ("Rosie"), who lived in Grand Rapids, Michigan. Rosie told him to expect a call from a woman named Sissy, who was the sister-in-law of Lee Gray. Sissy called Cody and told him that Lee Gray wanted Vandy Fletcher killed and was willing to pay $2,500 for it. Cody got in touch with Alton Mallory, and Mallory agreed to do it for $3,500. Cody relayed that information to Rosie, who in turn told Sissy. Rosie then called Cody to tell him that Sissy had agreed to the deal and had given Rosie half the amount up front. Mallory took the bus to Grand Rapids the next day to visit Rosie. The visit occurred a week before the murder. Rosie met Mallory at the bus stop and showed him the house where Fletcher lived on Franklin Street.
 
 
 30
 Cody testified that he and Mallory left for Grand Rapids on October 7th, 1975, the night before the murder. Cody drove his girlfriend Kennedy's car without her knowledge. Cody stated that he and Mallory took a rifle with them to Grand Rapids. They arrived in Grand Rapids at 10:00 p.m., stopped at Rosie's house and then went to a Holiday Inn. Their room was reserved under the name of Rosie Cook.
 
 
 31
 According to Cody, he and Mallory stayed in the room all night, where they were visited by Rosie, who gave Cody $2,500 in one hundred dollar bills. Cody testified that Mallory left about 7:30 or 8:00 the next morning and returned with overalls, sunglasses, hats and gloves which were in a bag that indicated they had been purchased at the Woodland Mall in Grand Rapids. Cody and Mallory put on the clothes and left about 9:15 a.m. They parked near Franklin Street, and Cody walked a short distance to retrieve a rifle which he had been told was concealed behind the door of an abandoned house on Worden Street. Mallory carried the rifle that had been transported in the car. After Cody got his rifle, Mallory told him to wait in the back yard and cover him. Cody watched Mallory go through some bushes to the back of Fletcher's house. After 20 minutes to a half hour, Cody testified that he saw Mallory shoot Fletcher, but that he could not see Fletcher from his vantage point.
 
 
 32
 Cody testified that he and Mallory drove back to Detroit that same day. On the way back, Cody took $700 of the money that he had received from Rosie and gave Mallory the rest. Cody stated that he told Kennedy he had used her car to drive to Grand Rapids and that she would have to "be strong" because her car might be stopped by police. According to Cody, he and Mallory never received the remaining $1,000 which was owed to them.
 
 
 33
 C. Discrepancies in Cody's Story.
 
 
 34
 The testimony taken at Cody's motion for new trial revealed a number of discrepancies between Cody's swown statement to police, subsequent statements made to the prosecutor in order to clarify his sworn statement, and his preliminary examination testimony. Cody also offered testimony at his motion for new trial which was at variance with any of the testimony which he had previously given.
 
 
 35
 1. Acquisition of the gun.
 
 
 36
 Cody testified in his sworn statement to the police that upon arriving in Grand Rapids he went directly from Rosie's house to the Holiday Inn, and that he retrieved his rifle on the morning of the murder. At the motion for new trial, however, Cody stated that he obtained the rifle immediately upon his arrival in Grand Rapids. Cody also testified in his sworn statement and at the preliminary examination that he retrieved the rifle from behind the door of an abandoned house on Worden Street. In his preliminary examination testimony, he added that he knew the rifle had been there since September. At the motion for new trial, however, Cody instead explained that he retrieved the gun from behind the stove in a garage at a different address.
 
 
 37
 2. Acquisition and disposal of the clothing.
 
 
 38
 Cody testified in his sworn statement that Mallory obtained the clothes from Woodland Mall between 7:30 and 8:00 on the morning of the murder. Cody's attorney stipulated, however, that Woodland Mall is closed between 10:00 p.m. and 10:00 a.m. Furthermore, witnesses described seeing two men on the night before the murder at the general scene of the crime in a car meeting the description of the car driven by Cody, and wearing the same clothes that Cody described had first been obtained by Mallory on the morning of the murder.
 
 
 39
 Moreover, Cody's subsequent statement to the prosecutor, following his sworn statement, indicated that he and Mallory took their clothes back with them to Detroit after the murder, and that upon their arrival Mallory took Cody's clothes from him. However, Cody later told the prosecutor that he and Mallory threw the clothes in a ditch on their way back to Detroit. Cody accompanied detectives to the area in which the clothes were allegedly discarded, but they were never located. At the preliminary examination, Cody testified that he could not remember what had happened to the clothing. At the motion for new trial, however, Cody again stated that they dumped the clothing in a roadside ditch on the way back from Grand Rapids.
 
 
 40
 3. Whereabouts the evening before the incident.
 
 
 41
 Cody's sworn statement to police was to the effect that they had arrived in Grand Rapids at 10:00 p.m. on the evening of October 7, 1975 and stayed at the Holiday Inn. However, police discovered from the motel ticket that they stayed at a different motel on the night of October 6th, 1975. At the motion for new trial, petitioner explained the discrepancy regarding the date of the motel ticket by stating that Rosie had reserved the room on the 6th. Petitioner explained the discrepancy regarding the name of the hotel by stating that they had been stopped by the police in the Holiday Inn parking lot on the night of the 6th and had decided to stay at a different hotel because they became nervous. Nonetheless, the police record of the stop indicated that it occurred in the Holiday Inn parking lot at 1:30 a.m. on the morning of October 7, 1975 roughly eighteen hours before petitioner claimed he had first arrived in Grand Rapids.
 
 
 42
 4. Amount of money received for the killing.
 
 
 43
 Cody testified in his sworn statement to police that he and Mallory agreed on $3,500.00 for the killing but only received $2,500.00, without affording any explanation as to why they accepted less than what they were owed. Cody also testified in his sworn statement that Sissy had given only half of the $3,500.00 to Rosie to give to Cody, but later in that same statement testified that Rosie gave him $2,500.00. Cody's sworn statement indicated he received $700.00 total for his role in the killing and that he gave Mallory the rest of the $2,500.00. At Mallory's preliminary examination, however, Cody testified he received between $1,000 and $1,500 and gave Mallory $750. At the motion for new trial, Cody offered no explanation for the inconsistencies in his sworn statement. He explained the discrepancy between his sworn statement and his preliminary examination testimony by stating that in the preliminary examination testimony he had meant he received between $1,000 and $1,500 total, not merely for himself. This, however, conflicts with his sworn statement that he had received a total of $2,500 from Rosie.
 
 
 44
 D. Substantial Breach of the Plea Agreement.
 
 
 45
 In denying Cody's petition for habeaus relief, the court district explained that the discrepancies in Cody's story were highly material:
 
 
 46
 The record in this matter indicates a gross deviation from full and truthful testimony. Petitioner changed his testimony in a number of areas, including how and where the gun was positioned during the shooting, how the individuals disposed of the clothing worn during the killing, and where petitioner and another individual stayed the evening before the incident, and exactly why they left. Furthermore, there was a factual discrepancy as to the amount of money petitioner received for the killing.
 
 
 47
 Although petitioner here argues that the discrepancies and alterations in his testimony "were not material," there is evidence from the prosecutor's testimony that because of these inconsistencies, the government could not verify the information and build a case. (1/17/90 Opinion, pp. 2-3).
 
 
 48
 Upon de novo review, we agree with the district court that these discrepancies, taken together, constituted a substantial breach of the plea agreement. In failing to testify truthfully, Cody deprived the prosecutor of corroborative evidence, and exposed himself to the likelihood of impeachment at trial. By maintaining that he and Mallory arrived in Grand Rapids at 10:00 p.m. on October 7, 1975, the night before the killing, went directly to Rosie's and then to the motel, and purchased clothing and picked up a second rifle the following morning, Cody created a story which differed significantly from that which could be provided by witnesses. The appellee's witnesses claimed they saw two men meeting the description of Cody and Mallory, dressed in overalls and carrying rifles, casing the scene of the crime the evening before the shooting, which corresponds to the police report that Cody was in Grand Rapids at least by 1:30 a.m. on October 7th. Furthermore, the discrepancies regarding the details of the murder--when and where the rifle was acquired, when and where the clothing was acquired and disposed of, and the amount received for the killing--could have been used by Mr. Mallory's defense attorney to further reduce Cody's credibility as a witness.
 
 
 49
 Even assuming that the discrepancies between Cody's sworn statement and his preliminary examination testimony could be ignored as a result of the prosecutor's agreement to abide by the plea bargain if Cody "came clean," Cody's testimony at his motion for new trial did not adequately explain the discrepancies between his various stories. Cody's insistence that he first arrived in Grand Rapids on the night of October 7, 1975, in light of a police report which clearly indicated his presence in Grand Rapids in the early morning hours of October 7th, indicates that Cody did not chose to finally "come clean" on his story. Moreover, Cody never offered any explanation for the various inconsistencies in his story regarding the disposal of the clothing or the amount of money he received for the killing. As stated by the circuit court in denying petitioner's motion for new trial:
 
 
 50
 Perhaps, as the Prosecutor suggests, he wanted to tell enough to make his deal but in such a way that Mallory and Gray would not be convicted. Perhaps Mallory and Gray weren't even involved but rather enemies to be removed for the Defendant by the State. Perhaps the Defendant is the type of person who just isn't interested in details. Whatever the reason or cause, it is clear to this Court that if a defendant wishes to cop a plea from a mandatory life offense to a five year sentence in exchange for information, the State has a right to expect that information to be accurate and truthful in every respect. (7/14/77 Opinion, p. 8).
 
 
 51
 For whatever reason, Cody's testimony makes it plain that he did not testify truthfully. Accordingly, we affirm the district court's judgment that Cody's due process rights were not violated when the prosecutor withdrew the plea bargain agreement because Cody failed to live up to his end of the bargain.
 
 III.
 
 52
 Cody's second claim is that he was denied a fair trial when the prosecutor asked leading questions of Kennedy and alluded to her indictment for perjury. During cross-examination, the prosecutor asked Kennedy if she recalled a conversation with Cody in which Cody asked her how "tough" she could be, and how well she could stand up under pressure. Kennedy replied that she did not remember such a conversation. The prosecutor then repeated the same question in slightly different language seven times, prefacing it with such statements as "You don't remember telling me personally...." At no time did Cody's attorney object to the questioning. Following her series of denials, the prosecutor asked Kennedy if she remembered being indicted for perjury in relation to false grand jury testimony which she had previously given in the case.
 
 
 53
 We reject Cody's claim that the prosecutor's leading questions warranted a new trial. In a habeas corpus proceeding, the scope of review is very narrow. In order for petitioner to prevail, he must do more than merely show that the conduct was erroneous; he must demonstrate that the prosecution's actions violated the "fundamental fairness essential to the very concept of justice." Donnelly v. De Christoforo, 416 U.S. 637, 642-43 (1974); Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir.), cert. denied, 444 U.S. 936 (1979). Furthermore, in deciding whether prosecutorial misconduct mandates reversal, we have held that the harmless error standard must be applied. Ebhardt v. Bordenkircher, 605 F.2d 275, 278 (6th cir. 1979).
 
 
 54
 When the brief exchange which petitioner challenges is viewed within the context of the trial as a whole, we conclude that it does not warrant a new trial. In Cook, we determined that although the prosecutor's misconduct, in the form of an attack on defendant's character that proclaimed him worse than all the "criminals" and "traitors" in hell, was "severe," it did not deprive him of a fair trial. We reasoned that the remarks were made in response to the defense counsel's arguments, the defense never objected, and the proof of guilt was overwhelming. 602 F.2d at 120-121. In this case, the attack was not on the defendant, but on a defense witness, and did not compare in severity to the character assassination which occurred in Cook. The relatively harmless nature of the exchange becomes even more apparent when it is recalled that the trial court gave explicit instructions to the effect that the jury had sole authority to evaluate the credibility of witnesses, and that the statements and questions of the prosecutor were not evidence. Finally, as in Cook, any error in the prosecutor's questioning was harmless beyond a reasonable doubt because of the overwhelming evidence of Cody's guilt.
 
 
 55
 We also conclude that the prosecution's allusion to Kennedy's indictment for perjury did not warrant a new trial. Relying upon United States v. Morrison, 535 F.2d 223, 228 (3d Cir.1976), Cody argues that the prosecutor's reference to Kennedy's perjury indictment amounted to an "effective intimidation of the witness" which denied him due process under the fourteenth amendment. Morrison, however, is readily distinguishable from the instant case. In Morrison, the prosecutor repeatedly warned a prospective defense witness about the possibility of a federal perjury charge if she testified falsely, and culminated his indirect warnings with a highly intimidating personal interview of the witness. As a result, when the witness was called to the stand she refused to answer more than thirty questions on the ground that the answers might incriminate her, thus depriving the defendant of much of the evidence he had expected to place before the jury. By contrast, in this case, the prosecutor referred to the perjury indictment only one time, and his allusion had no impact upon the witness' willingness to testify. Accordingly, we find that there was no due process violation. AFFIRMED.
 
 
 
 *
 The Honorable Barbara S. Hackett, U.S. District Judge for the Eastern District of Michigan, sitting by designation